[No. B122920. Second Dist., Div. Five. Nov. 1, 1999.]

WARREN B. WILLIAMSON et al., Plaintiffs and Appellants, v.
HECTOR PRIDA et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portion to be deleted from publication is enclosed in double brackets, [[ ]].

## COUNSEL

Gibson, Dunn & Crutcher, Susan M. Marcella, William A. MacArthur, Wesley L. Hsu; Law Offices of Ronald E. Hermanson and Ronald E. Hermanson for Plaintiffs and Appellants.

Ropers, Majeski, Kohn & Bentley, Michael J. Brady, Susan H. Handelman and Benjamin T. Rice for Defendants and Appellants.

## OPINION

**ARMSTRONG, J.**—Helmuth Von Bluecher and Héctor Prida are doctors of veterinary medicine. They treated a racehorse named Latin American, owned by Robert Marshall, Michael Jarvis, and Warren B. Williamson (the owners). In early May of 1993, Dr. Prida, who worked for Dr. Von Bluecher,[1] gave Latin American three injections of Oxytetracycline to the jugular. Later that month, Latin American developed a thrombosis, which caused a large swelling on his neck. The owners brought this lawsuit for veterinary malpractice, contending that the Oxytetracycline injections were not necessary and were given in a negligent manner, that the thrombosis was a result of those injections, and that the thrombosis permanently diminished Latin American's fair market value.[2]

Drs. Von Bluecher's and Prida's motion for nonsuit and directed verdict was denied, as was their motion for judgment notwithstanding the verdict and new trial. The jury found that Drs. Von Bluecher and Prida were negligent and awarded the owners $600,000 in damages. On this appeal, Drs. Von Bluecher and Prida ask that we order that judgment be entered in their favor, since there was no evidence that their actions were below the standard of care or caused the thrombosis, and for numerous other reasons. Since we agree that there was no evidence that Drs. Von Bluecher and Prida acted below the standard of care, and that their motion for judgment notwithstanding the verdict should have been granted, we need not consider their remaining contentions.

### Facts[3]

The owners bought Latin American in June of 1992 for $100,000. They entered him in various races around the country. Notably, on April 24, 1993, he won a race called the Californian, the biggest race of his career.

---

[1] The jury was instructed that Dr. Prida was Dr. Von Bluecher's agent. There is no challenge to that instruction here.

[2] The owners also contended that they suffered emotional distress, but the trial court ruled that those damages were not recoverable. The owners have filed a cross-appeal of that ruling, but our decision on the appeal means that we need not consider the question.

[3] We view the evidence in the light most favorable to plaintiffs, indulging all reasonable inferences in plaintiffs' favor. (*Osborn* v. *Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 259 [7 Cal.Rptr.2d 101].) Since there is no issue on appeal which depends on the evidence on damages, we do not summarize that evidence here.

On May 24, 1993, Latin American developed a thrombosis (that is, an inflammation of a blood vessel) in the right jugular.[4] There was a large swelling on the right side of his neck which seemed painful on palpation by a veterinarian. Afterward, Latin American ran in two additional races, but did not win either race. On July 29, 1993, Latin American broke his leg during training. The evidence was unequivocal that the broken leg was not caused by the thrombosis. After he broke his leg, Latin American no longer raced, but was retired as a stud horse.

Owner Marshall was Latin American's trainer, and Latin American was housed in a barn at the Hollywood Park racetrack with other horses owned or trained by Marshall. Drs. Von Bluecher and Prida, among others, were his veterinarians. After the Californian, barn foreman Ruben Cardenas noted that Latin American had nicks or scratches on the pastern. ("Scratches" are a bacterial skin condition.) Neither Cardenas nor Marshall saw signs of infection. The pastern was not swollen or hot or puss-filled.

On May 1, Dr. Prida examined Latin American at Cardenas's request. He saw that the pastern was swollen, hot, and puss-filled. A topical antibiotic had already been applied, but had not been effective. He administered three Oxytetracycline injections over three days. Dr. Prida testified that he gave all the injections to the left side. However, Cardenas, who held Latin American's head during the procedure, testified that while he could not remember which side of Latin American's neck Dr. Prida used for the May 1 or 3 shots, the May 2 shot was to the right side.[5] All experts called at trial testified that injections to the left jugular cannot cause a right-side thrombosis.

Marshall testified that after the thrombosis developed, he asked Drs. Von Bluecher and Prida about the possible cause. They told him that, based on their records, the only things they did which could have caused the thrombosis were the May Oxytetracycline shots.

Latin American had had other injections to the jugular. According to the owners' expert witness, veterinarian Robert Bradley, Latin American had had "a lot" of injections and was a heavily medicated horse. Dr. Von Bluecher gave Latin American a jugular injection of vitamins on May 6, 1993. He did not remember which side he gave the injection on, and no other witness testified about this injection. Other evidence established that between December of 1992 and the time the thrombosis appeared, Latin

---

[4]Witnesses also referred to this condition as "phlebitis."

[5]Cardenas also testified that he had an independent recollection that Latin American had been injected on the side on which the thrombosis appeared. In their brief, the owners interpret Cardenas's testimony to mean that all three Oxytetracycline shots were to the right side. At trial, their position was that Cardenas testified to only one shot to the right side.

American had had 25 jugular injections, 17 of which were given by either Dr. Von Bluecher or Dr. Prida. For instance, in the days before Latin American ran the Californian, he had injections of Butazolidin and Lasix, which are standard prerace treatments. On April 25, he had a standard postrace injection of vitamins. On May 13 and 19, Dr. Vince Baker gave him vitamin shots. Other than Marshall's testimony that the May 13 and 19 vitamin injections were to the left jugular, and Dr. Prida's testimony that most veterinarians work on the left side, there was no evidence about the side of the neck used for these injections.

Cardenas also testified that he would not inform a veterinarian that another veterinarian had previously treated a horse.

Dr. Bradley was asked whether Oxytetracycline treatment was appropriate if a horse had noninfected scratches which were not red or swollen or puss-filled. He answered that "I can't see the reason," that "My opinion is that I don't agree with that," and that treatment with Oxytetracycline under those circumstances was "overzealous treatment." Topical antibiotics could be used instead. Oxytetracycline was, however, appropriate if the horse was showing visible signs of inflammation, lameness, or infection. Dr. Bradley himself had used the drug under those circumstances. On cross-examination, he also opined that if Dr. Prida had found dermatitis or swelling on Latin American's pastern and had made a diagnosis of bacterial infection, Oxytetracycline would be an appropriate treatment. Since an infection could have an adverse effect on a horse's performance, prophylactic treatment, to prevent a problem from occurring, would be appropriate.

Defense expert Steven Buttgenbach testified similarly: where a horse had just run an important race and was to be raced again, use of Oxytetracycline was common for anything suspicious, to prevent infection. Dr. Buttgenbach also testified that Oxytetracycline was sometimes indicated where there was no major problem, because the California Racing Board allowed it be given immediately prior to a race, whereas a horse given certain other antibiotics, such as penicillin, could not race for 30 days.

The owners asked Dr. Bradley about the procedure for administering Oxytetracycline. He testified that when he gave an Oxytetracycline injection, he used his hand to close off the vein below the point where he wanted to inject, so that the vein filled with blood. He then inserted the needle into the vein. Because Oxytetracycline is thick, he diluted it with saline or by drawing blood into the syringe. He had a groom hold the horse's head and gave the shot slowly.

Dr. Prida testified to the procedures he followed in giving the Oxytetracycline injections to Latin American. First, he made sure that someone was

holding the horse's head. Next, he cleaned the neck with a swab of cotton and alcohol. Using his left thumb, he pressed on the jugular vein furrow to distend the vein, then inserted the needle through the skin into the vein. He pulled back on the syringe a little and drew blood into the syringe, to make sure that he was inside the vein. When he was sure he was in the vein, he injected the Oxytetracycline. He too gave the injection slowly. He did not see any adverse reaction after injecting Latin American.

Regarding the cause of the thrombosis, the owners elicited testimony from Dr. Bradley, Dr. Prida, and from defense witnesses. Dr. Bradley testified that the causes of thrombosis are frequent vena puncture (that is, putting a needle in the vein) which causes irritation to the vein, and leakage outside the vein of the product being injected. A series of medications over a long period of time could irritate the vein and cause thrombosis. Dr. Bradley explained "In other words, you have a product that's irritating outside the vein. The animal tolerates it intravenously, but if you let a little bit leak outside, it can cause irritation to the vessel and set up a thrombosis-type situation." Dr. Bradley testified that "When you stick the needle in the vein, you insult that vein is the word. You irritate that vein by puncturing it with a needle and, therefore you set up an inflammatory process. So depending on the number of times you go into that vein or what you are using or what leaks outside the vein rather than into the bloodstream itself has an effect on the thrombosis formation."

Dr. Bradley also testified that Oxytetracycline is a thick drug which requires dilution and a fairly large-bore needle.[6] The large needle made a larger opening in the vein, was more irritating, and created a greater risk of some of the blood or antibiotic product leaking out of the vein.

Dr. Prida testified that Oxytetracycline is one of the known causes of thrombosis. Vitamin injections were seldom a cause. Other causes were an injection in which the needle went through the vein, an infection, or a spontaneous thrombosis. The last was very unlikely.

Finally, defense expert witness Dr. Robert Baker testified that every veterinarian knows that if Oxytetracycline is given perivascularly, that is, outside the vein, it can cause a thrombosis.

Dr. Bradley was asked a number of hypothetical questions, and testified that if that Latin American had received only one injection to the right jugular, the May 3 Oxytetracycline shot, that the most likely cause of the

---

[6]Dr. Prida customarily used a slightly smaller needle to give an Oxytetracycline shot than did Dr. Bradley.

thrombosis was that injection. If Latin American received an Oxytetracy-cline shot to the right side on May 3, and a vitamin shot to the right side on May 5, "the primary—the initiating causes would be the shot given on the 3rd, then it's possible that the second shot augmented the first shots and made it even worse." If Latin American received a May 3 Oxytetracycline shot to the right jugular and vitamin injections on May 5, 13, and 19, the probable cause of the right side thrombosis was "the product probably didn't get all in the vein. Probably some of it was outside the vein." When asked what product he was referring to, he said that it could either have been the vitamins or the Oxytetracycline. Bradley testified that one injection to the right jugular on May 3 could cause a thrombosis to appear on May 24.

## Discussion

We agree with Drs. Von Bluecher and Prida that the owners did not establish any breach of the standard of care, and that the judgment must be reversed.

No medical malpractice claim is viable without expert testimony establishing the appropriate standard of care. (*Selden* v. *Dinner* (1993) 17 Cal.App.4th 166, 174 [21 Cal.Rptr.2d 153].) "The standard of care in a medical malpractice case requires that physicians exercise in diagnosis and treatment that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. [Citations.]" (*Munro* v. *Regents of University of California* (1989) 215 Cal.App.3d 977, 983-984 [263 Cal.Rptr. 878].) Standard of care " 'is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman.' [Citations.]" (*Landeros* v. *Flood* (1976) 17 Cal.3d 399, 410 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324].)

Although no California case has considered the application of this rule to veterinary malpractice claims, Drs. Von Bluecher and Prida argue (as they did, successfully, in the trial court), that the rule should apply. The owners do not disagree, although they do argue that in this case, as in certain medical malpractice cases, the doctrine of res ipsa loquitur applies. We consider that contention later in an unpublished portion of this opinion.

In medical malpractice cases, the established rule is that a doctor must exercise the degree of skill or care usual in the profession, and will not be held liable for untoward consequences in the absence of a want of such

reasonable care and skill. (*Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 475 [234 P.2d 34, 29 A.L.R.2d 485]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 774.) We find that this standard applies to veterinary malpractice cases, as well. Veterinarians, like medical doctors, are licensed health care providers (Bus. & Prof. Code, § 4800 et seq.), and veterinary malpractice cases are treated like medical malpractice cases for purposes of statute of limitations. (Code Civ. Proc., §§ 340.5, 597.5.) Further, out-of-state courts that have considered the question have held that standards governing medical malpractice actions control in veterinary malpractice cases. (*Ladnier* v. *Norwood* (5th Cir. 1986) 781 F.2d 490, 492 [Louisiana law]; *Spilotro* v. *Hugi* (1981) 93 Ill.App.3d 837, 841-842 [49 Ill.Dec. 239, 243, 417 N.E.2d 1066, 1070]; *Storozuk* v. *W. A. Butler Company* (1964) 3 Ohio Misc. 60, 61-62 [203 N.E.2d 511, 512-513]; *Bekkemo* v. *Erickson* (1932) 186 Minn. 108, 110, 112 [242 N.W. 617, 618- 619].)

"The gravamen of [a veterinary malpractice] action is that in providing veterinary care, the veterinarian failed to use such reasonable skill, diligence, and attention as might ordinarily have been expected of careful, skillful, and trustworthy persons in the profession. The courts have generally recognized that for the owner of an animal to prevail in such an action, he or she must prove the relevant recognized standard of care exercised by other veterinarians, the defendant veterinarian's departure from that standard when treating the animal, and some injury to the owner proximately caused by that departure." (Annot., Veterinarian's liability for malpractice (1989) 71 A.L.R.4th 811, 816, § 2a.)

In order to examine the evidence on standard of care, we must first examine the owners' theories of negligence. At trial, the owners' case was that it was negligent to give the Oxytetracycline shots, since they were risky and unnecessary, and that Dr. Prida gave one or more of the shots in a negligent manner. They had two theories of causation, contending both that the Oxytetracycline shots irritated the vein and caused the thrombosis, and that Dr. Prida gave the shots in a negligent manner, that is, that he injected outside the vein, or through the vein, and in that manner caused the thrombosis. There was no evidence of standard of care on either theory.

First, as to the theory that the negligence was in choosing to treat with Oxytetracycline (a theory which the owners do not emphasize on appeal) the only evidence on standard of care was Dr. Bradley's testimony that he "didn't agree with" the use of Oxytetracycline for noninfected scratches, "couldn't see the reason," and thought it was "overzealous." This is not evidence of standard of care. "[T]he fact that another physician or surgeon

might have elected to treat the case differently or use methods other than those employed by [the] defendant does not of itself establish negligence. [Citation.]" (*Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 87 [147 P.2d 604].) The merit of this rule is illustrated by the facts of this case. Dr. Bradley, who was not a racetrack veterinarian, could not see a reason for giving the Oxytetracycline shots. Other veterinarians, who did work at racetracks, testified that the treatment was appropriate as a preventative treatment for horses with scratches, who were to race in the near future. This disagreement does not establish the standard of care, or a violation thereof.

As to the contention that Dr. Prida gave the shot in a negligent manner, injecting through the vein or outside the vein, the owners argue that they introduced sufficient evidence of standard of care through Dr. Prida's testimony that it is not proper to inject in the vein and pierce outside the vein. They also cite Dr. Prida's testimony that he did not want to inject outside the vein because it could cause inflammation, and Dr. Baker's testimony that every veterinarian knows that Oxytetracycline given outside the vein can cause a thrombosis.

There are several flaws with this argument. First, there is no evidence that Dr. Prida did inject outside the vein or pierce through the vein. Instead, the evidence was that Dr. Prida used the procedures described by Dr. Bradley. He made sure Latin American's head was restrained, located the vein, drew a small amount of blood into the syringe in order to ascertain that he was within the vein, and proceeded slowly. The owners seem to suggest that the fact that the thrombosis occurred is proof that Dr. Prida gave the shot outside the vein. However, since Dr. Bradley testified that thrombosis is a risk of any Oxytetracycline injection, even if given correctly, proof of the thrombosis is not proof of negligent administration of the injection.

■ Moreover, "proof of lack of *proper* care and skill in a given treatment or failure to treat in a certain way is not sufficient to establish a case of malpractice on the part of a physician. The law does not require that the advice, instructions[,] and treatment given by a physician to a patient shall be at all events *proper*, or that his treatment should be such as to attain an approximate perfect result. It requires only, first, that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in that locality, and, second, that he shall exercise reasonable and ordinary care and diligence in treating the patient and in applying such learning and skill to the case. *Proper* treatment implies that no error shall be committed thereby, that an approximate perfect result will be produced, and that such result is guaranteed, whereas the law only demands

that the physician use reasonable care to attain such approximate perfection." (*Rasmussen* v. *Shickle* (1935) 4 Cal.App.2d 426, 429 [41 P.2d 184], italics in the original.)

[[/]]*

The lack of evidence establishing the standard of care means that there was no substantial evidence to support the verdict, and Drs. Von Bluecher and Prida's motion for judgment notwithstanding the verdict should have been granted. We direct the trial court to render that order on remand.

### Disposition

The judgment is reversed, and the trial court is directed to enter an order of judgment in Drs. Von Bluecher's and Prida's favor. Drs. Von Bluecher and Prida to recover costs on appeal.

Grignon, Acting P. J., and Godoy Perez, J., concurred.

A petition for a rehearing was denied December 1, 1999, and on November 18, 1999, the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied February 16, 2000.

*See footnote, *ante*, page 1417.