Filed 3/12/13  Quigley v. McClellan CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KAREN QUIGLEY,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>PAUL MCCLELLAN et al.,<br><br>     Defendant and Appellant. | D060776<br><br><br><br>(Super. Ct. No. 37-2009-00061344-CU-MM-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy M. Casserly, Judge.  Reversed.


Defendants and appellants Paul McClellan and San Dieguito Equine Group (together Dr. McClellan) are doctors of veterinary medicine.  Dr. McClellan was retained by plaintiff and respondent Karen Quigley to perform prepurchase examinations on two performance horses named Syrus and Poncho.  Dr. McClellan performed the prepurchase examinations and concluded that both horses were suitable for their intended uses as

competition hunter jumper horses. Based on this information, Quigley purchased Syrus and Poncho. Sometime after the purchase, the horses began to manifest physical problems that interfered with their ability to compete. Quigley then brought this lawsuit for veterinarian malpractice against Dr. McClellan, arguing that he negligently performed the prepurchase examinations of both horses.

Dr. McClellan's motion for nonsuit was denied, as were his postjudgment motions for judgment notwithstanding the verdict and new trial. A jury returned a special verdict finding that Dr. McClellan was negligent in performing the prepurchase examination of Poncho, but not negligent in his examination of Syrus. The trial court entered judgment on the verdict awarding Quigley $46,000 in damages. Dr. McClellan now appeals the judgment and the order denying his motions for judgment notwithstanding the verdict and nonsuit. He asks that we order judgment be entered in his favor, since there was no substantial evidence of an applicable standard of care, or that he failed to adhere to that standard in performing the prepurchase examination of Poncho. We conclude there was no evidence of an applicable standard of care, and the judgment therefore must be reversed.

# FACTUAL BACKGROUND[1]

## 1. Poncho's Medical History

Poncho is a performance horse who competes in hunter jumper competitions. In January 2006, he began to manifest physical signs of a left hind lameness[2] that was interfering with his ability to perform in competition. He was then taken to Dr. McClellan to be evaluated for the cause of his lameness. Dr. McClellan performed a bone scan, radiographs, and an x-ray to pinpoint the source of Poncho's lameness. The test results showed that Poncho was suffering from a condition in the cervical facets (vertebrae) of his neck. Dr. McClellan treated Poncho's condition by administering injections directly into Poncho's neck. This treatment alleviated Poncho's lameness and performance issues.

A month later, Poncho's lameness issues returned and he was pulled from his competition training. Poncho remained "laid up" from his training for the next six months. Poncho continued to compete as a hunter jumper horse for the next two years. During that time, however, Poncho would occasionally show lameness in his legs. Each time Poncho exhibited lameness he was taken to Dr. McClellan for treatment. Dr.

---

[1] We view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.) Since the judgment in this case resulted in favor of Quigley only in regards to the horse Poncho, we will constrain our recitation of the facts only to the evidence pertaining to that horse.

[2] Lameness is a term used to refer to a number of conditions where the horse fails to travel in a regular and sound manner on all four feet.

McClellan administered injections into the cervical facets of Poncho's neck to treat his lameness issues.

## 2. *The Lease Period*

Quigley, an owner and rider of competition hunter jumper horses, was informed that Poncho was available for sale in August of 2008. At the time, Quigley's trainers, Mary Gatti and Candise Pipkin (together the trainers), encouraged her to look into purchasing Poncho because he would "be good for [her] riding" and help make the competition schedule easier for her other horse. Instead of outright purchase of the horse, Quigley first leased Poncho for a trial period.

During the leasing period, the trainers contacted Dr. McClellan and asked him if he could release Poncho's medical history. The trainers were aware that Dr. McClellan was Poncho's current treating veterinarian. On September 12, 2008, Dr. McClellan responded to the trainers' inquiry in an email. His email explained that the horse had a "habit of starting out stiff and warming out of it," and that he had looked at the horse numerous times and performed diagnostic blocks, bone scans, and radiographs. He further explained that he had concluded that Poncho's "neck was a significant part of his problem" and that it had been treated with injections. However, Dr. McClellan did not go into detail about what tests and treatments had been done on Poncho.

Dr. McClellan also called Gatti to discuss Poncho's medical history. Dr. McClellan wanted to make sure that they wanted to purchase Poncho because he was a horse who was "going to require some maintenance." He then "went over [Poncho's medical] history detail by detail." At the conclusion of the discussion, Gatti asked Dr.

4

McClellan to write down the dates of the treatments he had given to Poncho. That way, the trainers could follow up on Poncho's treatments with their regular veterinarian, if they decided to purchase the horse. Dr. McClellan recorded the dates of the treatments, but did not send a copy of Poncho's complete medical history to the trainers.

### 3. *The Prepurchase Examination*

After leasing Poncho for approximately two months, Quigley decided she wanted to purchase the horse. Before finalizing the purchase, however, she wanted to have a prepurchase examination performed on Poncho to make sure he was healthy and sound enough to compete as a hunter jumper horse. Quigley then contacted the trainers and asked them to schedule a prepurchase examination with Dr. McClellan because of his history with Poncho. The trainers scheduled the appointment.

On October 30, 2008, Dr. McClellan performed the prepurchase examination on Poncho. The prepurchase examination consisted of both a physical evaluation and medical testing. The prepurchase examination yielded some abnormalities. Specifically, Dr. McClellan noted that Poncho had "low heels on both of his forefeet" and he had a slight "left hind lameness." Further, after examining Poncho's radiographs, Dr. McClellan found that Poncho was suffering from "two kissing spines" and "a small spur on [his] left stifle." However, Dr. McClellan opined that Poncho's "way of moving was essentially unchanged from over the couple years" that he had known the horse. Based on his findings and his past knowledge of the horse, Dr. McClellan concluded that Poncho would be suitable to use as a competition hunter jumper horse.

5

Dr. McClellan recorded all his findings and conclusions in a written prepurchase examination report. At the bottom of the report, Dr. McClellan included a note that stated "Per discussion with [Gatti], a summary of the treatment history is outlined below." Below the note, Dr. McClellan wrote a brief outline of the treatments he had administered to Poncho, and the dates he provided those treatments. This included the cervical facet injections that he administered to Poncho between 2006 and 2008. A copy of this prepurchase report was sent to Quigley and the trainers.

After Dr. McClellan finished the prepurchase examination, he called Quigley and left a voicemail on her cell phone. Dr. McClellan explained all the findings and conclusions that he had drawn from the prepurchase examination of Poncho. Further, he explicitly noted that he had administered cervical facet injections to Poncho in the past. However, he explained that Poncho was "sound" on the day of examination and that he believed the horse was suitable for his intended use.

### 4. Quigley Purchases Poncho

Based on Dr. McClellan's representations, Quigley purchased Poncho on November 23, 2008. Shortly thereafter, Quigley began to ride and train Poncho for competition. In January of 2009, Poncho started to exhibit lameness issues in his front legs. He was then taken to veterinarian Sylvia Ouellette for an evaluation. Quigley informed Dr. Ouellette that Poncho had a long history of medical issues and that he had a spur in his left hind stifle joint, a kissing spine, and cervical pain. She further explained that about every six months for the past two years, Poncho was treated for these conditions with injections into the cervical facets of his neck. Quigley and Gatti asked

6

Dr. Ouellette to administer the neck injections to see if Poncho's lameness would improve. Dr. Ouellette administered the neck injections, but also recommended that Poncho be subjected to a bone scan.

Poncho was then referred to Dr. McClellan, and a bone scan was administered. The results of the bone scan revealed a "hot spot" on Poncho's left front elbow. Dr. McClellan then performed an x-ray on the elbow to determine the cause of the "hot spot." The x-ray revealed that Poncho had a large bone cyst in his elbow joint. To treat Poncho's bone cyst, Dr. Ouellette administered injections directly into Poncho's elbow. While these injections alleviated Poncho's lameness, he was unable to immediately return to his competition training. A year later, Poncho began to manifest lameness problems once again, and was pulled from his training. Poncho can no longer be ridden as a competition hunter jumper horse because of the limitations caused by his bone cyst.

5. *Quigley Receives Poncho's Medical History*

In March of 2010, Quigley received a copy of Poncho's prior medical history from her local veterinarian, Dr. Greenman. This was the first time that Quigley had seen Poncho's medical history, and the information contained in it concerned her. Specifically, she was concerned about the fact that Poncho's medical history indicated that the horse had been lame multiple times through the time frame of January of 2006 to June of 2008, and that the horse had "laid up" for a six month period. This was all new information to Quigley because Dr. McClellan and her trainers never told her about Poncho's past medical issues before she purchased the horse. If she was provided this information during the prepurchase examination, she would have never bought the horse.

7

PROCEDURAL BACKGROUND

In October 2009, Quigley filed a complaint against Dr. McClellan and San Dieguito Equine Group.  As relevant to this appeal, she alleged a cause of action for veterinarian malpractice against Dr. McClellan and San Dieguito.[3]  She argued that Dr. McClellan had been negligent in performing the prepurchase examination of Poncho. The matter proceeded to trial.

After Quigley presented her case-in-chief, Dr. McClellan moved for nonsuit on the ground that Quigley's expert witness failed to testify to an applicable standard of care. The court denied the motion.

After weighing the evidence, the jury returned a special verdict finding that Dr. McClellan and San Dieguito Equine Group were negligent in performing the prepurchase examination of Poncho.  The court then entered judgment on the verdict awarding Quigley $46,000 in damages.  After the entry of judgment, Dr. McClellan filed motions for judgment notwithstanding the verdict and new trial.  After hearing oral argument, the court denied the motions.  Dr. McClellan timely appealed the judgment and the denial of his motions for nonsuit, new trial, and judgment notwithstanding the verdict.

---

[3]     Quigley's complaint alleged causes of action for veterinarian malpractice, intentional and negligent misrepresentation, fraud, and breach of fiduciary duty. However, based on the special verdict form provided to the jury it seems the case only proceeded to trial on the claim of veterinarian malpractice.

DISCUSSION

I

*STANDARDS OF REVIEW*

This case is governed by the substantial evidence standard of review.  When a trier of fact's resolution of disputed facts is challenged on the ground that there is no substantial evidence to sustain it, the power of the appellate court begins and ends with the determination as to whether on the entire record, there is substantial evidence contradicted or uncontradicted that supports the finding.  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)  This standard, however, does not require us to blindly seize any evidence in support of the trier of fact's findings in order to affirm the judgment.  (*Kuhn v. Department of General Services, supra,* 22 Cal.App.4th 1627, 1633.)  Rather, it compels us to determine whether a reasonable trier of fact could have found for the respondent based on the entire record.  (*Ibid.*)  This is so because substantial is not synonymous with "any" evidence, but refers to the quality, not the quantity of the evidence.  (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.)  So, after reviewing the whole record, we must determine whether there exists substantial evidence which is evidence of ponderable legal significance that is reasonable, credible and of solid value, supporting the challenged findings of the trier of fact.  (*Ibid.*)  While substantial evidence may inevitably consist of inferences, they must be the result of logic and reason emanating from the evidence and not mere speculation or conjecture.  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  It must actually be

9

substantial proof of the essentials the law requires in the particular case. (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644.)

## II

## *STANDARD OF CARE*

On appeal, Dr. McClellan contends that the judgment should be reversed because there was no substantial evidence in the record from which the jury could have found negligence. Specifically, he asserts that there is no substantial evidence in the record to support either (1) the existence of an applicable standard of care, or (2) that he failed to adhere to that standard in performing the prepurchase examination of Poncho. We conclude that there is no evidence in the record of a relevant recognized standard of care exercised by other veterinarians in the community, and, therefore, the judgment must be reversed.

To establish a veterinarian malpractice claim, a plaintiff is required to present expert testimony establishing the appropriate standard of care in the relevant community. (*Williamson v. Prida* (1999) 75 Cal.App.4th 1417, 1424-1425 (*Williamson*).) " 'Standard of care " 'is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations] . . . .' " [Citation.]' " (*Id*. at p. 1424, quoting *Landeros v. Flood* (1976) 17 Cal.3d 399, 410.) This is because " '[t]he standard of care in a [veterinarian] malpractice case requires the [veterinarian] exercise in diagnosis and treatment that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical

10

profession under similar circumstances.  [Citations.]' "  (*Williamson*, *supra,* 75 Cal.App.4th at p. 1424.)

## A.  Expert Testimony: Standard of Care

Quigley sought to establish the standard of care and its breach through the testimony of her expert witness, veterinarian Peter Heidmann.  Dr. Heidmann was questioned as to the standard of care as follows:

> "[Question]:  From your general training and experience is there a standard of care applied to veterinarians in prepurchase examinations?
>
> "[Answer]:  There is.
>
> "[Question]:  And can you tell us that standard?
>
> "[Answer]:  A lot depends on the kind of horse.  The three critical parts of the prepurchase *to me* are identifying the problems . . . [¶] . . . [¶] . . . documenting them, and then explaining the relevance, potential relevance, of those problems to the client, to the potential buyer."  (Italics added.)

Dr. Heidmann further explained "the communication is the most important part [of the prepurchase examination], *so to me* -- not just indentifying the problems but discussing the problems in detail in a way that a client can understand it is the critical thing."  (Italics added.)

In regards to the prepurchase examination of Poncho, Dr. Heidmann testified that he reviewed the prepurchase examination and the horse's medical history report.  Dr. Heidmann was then asked how Dr. McClellan fell below the standard of care in regards to Poncho's prepurchase examination.  He responded:  "There's several issues, again, *to me*, issues of interest in this exam:  Bad neck, arthritis and bad stifle arthritis were both

11

identified as well as some abnormalities further back in the spine. Any of those issues can be very difficult to manage, especially the neck arthritis that had required multiple joint injections. [The] [m]ore times that a joint is injected, the more likely it is that the injections are going to work less well in the future, and that's obviously an area that's important to the horse. As a jumper, they have to arch their neck to get up and over the jump, so arthritis in that area can be excruciating for the horse. I wouldn't worry about a time or two, but multiple times is a very big concern." (Italics added.) He was then asked whether Dr. McClellan fell below the standard of care in reaching the conclusion that Poncho was suitable for his intended use. Dr. Heidmann answered: "Again, the likelihood of the horse remaining suitable for its intended use, because of the long history of cervical facet injections, meaning neck injections, is very low, and I would have a hard time -- I could not call him suitable for his intended use."

Dr. Heidmann also testified that some significant abnormalities in Poncho's medical history were excluded from the prepurchase examination, and Dr. McClellan should have disclosed that information to Quigley. Dr. Heidmann explained: "*To me* one of the most significant, again, relating to [Poncho's] neck is a known problem at the time of the exam. There's notes from January 24th, 2006, ultrasound and x-rays of the neck that show pretty significant arthritis, and those were read by a board certified radiologist, both ultrasound and x-rays, which those two modalities really complement each other in terms of getting a full picture of what's going on, and they describe significant arthritis there . . . and I don't see any mention of that on the prepurchase." (Italics added.) He further testified that "there should have been discussion of these findings" because

12

"they're obviously technical and interpretation is -- is open to question, so there needs to be some discussion of what the potential significance of these are." Dr. Heidmann was then asked whether the standard of care requires that this information be explained directly to the buyer or the buyer's trainers. He then answered: "[T]he easiest way to avoid problems is to talk to everybody and have them all together in a room." Although, he further testified that this process is "not always possible" and it is not "essential." Dr. Heidmann then explained that Dr. McClellan fell below the standard of care in disclosing the information regarding Poncho because "there are a lot of -- a lot of different abnormalities present in [Poncho] . . . . And I don't see many of those abnormalities documented. So they may have been discussed. It doesn't sound like [it was] discussed adequately and certainly not documented adequately." Dr. Heidmann further explained: "I think [the veterinarian's] responsibility -- . . . -- is to discuss the findings comprehensively, every one of those findings. I want to empower my clients to make the most informed possible decision. So when details are excluded, it compromises their ability to make a good, informed decision."

B. *Analysis: Dr. Heidmann Did Not Testify to an Applicable Standard of Care*

We note once again that the standard of care in a veterinarian malpractice case requires the veterinarian to exercise the same " 'reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances.' " (*Williamson*, *supra¸* 75 Cal.App.4th at p. 1424.) In order to establish what that degree of skill, knowledge and care is, there must be expert testimony

13

explaining how the average veterinarian of ordinary skill and knowledge from the relevant community would have treated the case under similar circumstances.

Here, Dr. Heidmann never testified that Dr. McClellan's performance of the prepurchase examination of Poncho, or the subsequent disclosure of the horse's medical history, "was not consistent with what other *doctors in the community* would have arrived at under similar circumstances in the exercise of reasonable care." (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 87, italics added.) From what can be ascertained from the record, it appears that Dr. Heidmann simply disagreed with the conclusions that Dr. McClellan drew from the prepurchase examination, and he thought that "the best approach" in disclosing Poncho's medical history would have been to have a discussion with both Quigley and the trainers. However, this testimony, by itself, does not establish the standard of care. "[T]he fact that another physician or surgeon might have elected to treat the case differently or use methods other than those employed by [the] defendant does not of itself establish negligence." (*Ibid.*; see *Williamson, supra,* 75 Cal.App.4th at pp. 1425-1426.)

Without explaining how an average veterinarian of ordinary skill would have treated the facts of this case differently than Dr. McClellan, it cannot be said that Dr. Heidmann's testimony established any relevant recognized standard of care. Since we conclude that there was no evidence establishing the standard of care, then there was no substantial evidence to support the jury's verdict of negligence. Therefore, the judgment must be reversed.

DISPOSITION

The judgment is reversed.  Dr. McClellan and San Dieguito Equine Group are awarded costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


McDONALD, J.