Filed 12/18/13   Guo v. American Plus Bank CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TERRY GUO et al.,<br><br>　　　Plaintiffs and Respondents,<br><br>　　　v.<br><br>AMERICAN PLUS BANK, N.A.,<br><br>　　　Defendant and Appellant. | B233780<br><br>　(Los Angeles County<br>　 Super. Ct. No. KC054847)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br>[No Change in Judgment] |

GOOD CAUSE appearing, the opinion filed November 20, 2013, in the above entitled matter is hereby modified as follows:

1.     On page 1, line 2 under the caption, replaced "Reversed." with "Reversed and remanded with directions."

2.     On page 2, lines 3, 4, 13, and 17 in Section 1. of FACTS AND PROCEDURAL HISTORY, replace "Golden Bear" with "Glory Bear".

3.     On page 3, lines 4, 8, and 13, replace "Golden Bear" with "Glory Bear".

4.     On page 16, line 1 of the DISPOSITION, delete the first sentence that begins "The judgment against . . ." and replace it with the following:  "The judgment against the bank is reversed and the matter is remanded to the trial court with directions to enter a new and different judgment for appellant."

[end of modifications]

There is no change in judgment.

The petitions for rehearing by both appellant and respondents are denied.

_____

BIGELOW, P. J.                    RUBIN, J.                    GRIMES, J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TERRY GUO et al., | B233780 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. KC054847) |
| v. | |
| AMERICAN PLUS BANK, N.A., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Peter J. Meeka, Judge. Reversed.

Horvitz & Levy, LLP, Barry R. Levy, H. Thomas Watson and Daniel J. Gonzalez; Ku & Fong and H.G. Robert Fong, for Defendant and Appellant.

Law Offices of Steven P. Scandura and Steven P. Scandura; Howard Posner, for Appellants and Respondents.

_____

American Plus Bank, N.A., appeals from the judgment entered after a jury found it liable for conspiring to defraud a group of land investors. We reverse the judgment because there was insufficient evidence to support the verdict.

## FACTS AND PROCEDURAL HISTORY

1.  *General Background*

The Glory Bear Valley limited liability corporation was formed in August 2007 to take title to and eventually develop a 10-acre parcel of commercial real property in Victorville. Golden Bear took title on October 31, 2007. Half of the $3.95 million purchase price came from Golden Bear's several shareholders while the other half was financed by a one-year loan from American Plus Bank. The plan as described to the shareholders involved obtaining a construction loan to pay off the purchase loan and finance development of the property.

The organizers and promoters of this venture were land developer Steven Hsieh and real estate agent Mu-Lan Berry.[1] Terry Guo invested $905,540, which gave him a 38 percent interest. Several members of the Wong Family invested $510,574, which gave them a 22 percent interest. The Mao Group – comprised of Melanie Mao, Lin Lin Wong, Li Li Cheng, and Meiling Lin – invested $1.15 million, giving it a 30 percent interest. Hsieh and Berry were appointed co-managers of Golden Bear and each held a one and one-half percent interest in the project.[2]

As the Great Recession gathered steam in 2008, property values plummeted. Construction plans for the site were uncompleted and no attempt was made to obtain a construction loan. The bank agreed not to foreclose on the land if Golden Bear paid down the loan principal in an amount that would maintain the 50-50 ratio between the principal and the value of the land. Hsieh and the Wong group refused to pay any more

---

[1]    Berry was also known as Jennifer Wang.

[2]    Investors who were not parties to this action held the remaining seven percent.

4

money, so the Mao Group paid down the principal by the required amount. This was repeated in 2009. As a result, the Mao Group paid the Bank approximately $900,000 in additional funds to prevent a foreclosure.

Pursuant to the terms of the Golden Bear operating agreement, the Mao Group then sued Hsieh to compel him to increase the Mao Group's pro rata share and dilute the shares of Guo and the Wongs for their failure to contribute to the loan pay-down. Hsieh and the Mao Group settled their dispute with an agreement that the Mao Group's additional payments would be treated as a debt of Golden Bear, leaving each investor with his or her original investment share. However, the complaint by Mao triggered cross-complaints by Guo and the Wong Family against Hsieh, Berry, the Mao Group, the bank, and the architect hired by Hsieh to prepare plans for developing the property.[3]

Guo and the Wongs alleged that Hsieh concealed that he or his parents owned the land that Golden Bear purchased and that Hsieh was trying to dump the land because property values had started to decline and were expected to continue dropping. Hsieh allegedly pulled this off by falsely representing the development project's viability. This included the use of professional looking plans and renderings of the proposed project, by stating that a construction loan had been approved, and by telling Guo and the Wongs that they would not be asked to pay any more than their initial contributions. The bank allegedly conspired with Hsieh to carry out his fraudulent scheme by making the loan that made it possible for the sale to go through. Two members of the Mao Group allegedly took part in this fraud by funneling back to the bank some of the sales proceeds that went to the sellers.

The jury found that Hsieh and Berry committed fraud but that the Mao Group had not. The jury also found that the bank conspired with Hsieh and Berry. The bank was held jointly and severally liable for damages of more than $900,000 for Guo and $540,000 for the Wong Family.

---

[3]    Even though Guo and Wong started out as cross-complainants, the court designated them as plaintiffs and the cross-defendants in their actions as defendants. We will treat the parties the same way.

2.      *Evidence At Trial*

    A.      Evidence Concerning Hsieh's Ownership of the Property

The sellers of the property were a man and woman with the last name Hsieh. They lived in Taiwan and bought the property in 1987. Guo testified that he did not learn that the sellers had the same last name as Hsieh until October 2008. However, the sellers' names appeared on at least two escrow documents signed by respondent Walter Wong.

Hsieh is also from Taiwan and moved to California in 1987. Documents prepared by the sellers showed that the woman (Hsi Tsung Hsieh) was born in 1945 and that the man (Chuang Chi-Hui Hsieh) was born in 1941. Hsieh graduated college in 1984, which meant that the sellers were old enough to be his parents. The parties stipulated that "Hsieh" was the 5774th most common surname in the United States and belonged to only one in 49,020 Americans. There was no evidence concerning the frequency of the surname Hsieh in either Taiwan or Mainland China, however.

Hsieh denied being related to the sellers. He testified that Hsieh was not his original surname. It was instead his mother's surname, which he adopted after his father died in 2005. Lucy Chien, who was the sellers' real estate agent, testified that Chuang Chi-Hui Hsieh was her older brother and Hsi Tsung Hsieh was her sister-in-law. They were not married to each other, however. Steven Hsieh was not a member of her family.

When the seller Hsiehs took title to the land in 1987, they did so with each taking a one-half interest as their sole and separate property. Information statements prepared by the sellers left blank the lines where the names of their spouses were to be designated, and they both lived at separate locations. They did work at the same company, however.

    B.      Evidence Concerning Formation of Glory Bear

Guo knew Berry and had taken part in other real estate investments with her. In May 2007 Hsieh and Berry took Guo to see the Victorville property. Guo knew the real

6

estate market was already in decline but thought the property's location made it a good investment opportunity. After Guo made an initial investment, Berry contacted Walter and Ellen Wong. Like Guo, the Wongs knew that real estate prices were dropping but believed the property could become profitable.

On May 27, 2007, Hsieh and Guo made an offer to buy the property for $3.58 million. The sellers rejected that offer, and the parties eventually settled on a sale price of $3.95 million. The other eventual investors joined in and it was agreed that Glory Bear would be formed as the vehicle for the investment project.

C.    Evidence Concerning the Bank's Loan

The loan was made at an interest rate of 8 percent. Interest payments were to be made monthly, and the bank required Glory Bear to pay $185,000 up front into an interest reserve account. The loan was secured by a first trust deed on the property and Berry was a guarantor of the loan. The principal balance of $2.16 million was to be repaid in one year. A loan fee of .25 percent was charged. Although applicable banking regulations would have allowed the bank to loan 65 percent of the value of the property, it agreed to loan only half the value, and insisted that Glory Bear pay down the principal to maintain that ratio as property values declined.

Hsieh and Berry applied for the loan on the bank's first day of operations – August 8, 2007. Bank president Kuoliang Huang testified that he did not know Hsieh before that time and knew Berry only by reputation. Huang drove out with them to see the property.

The loan was approved by a seven-member bank director's loan committee on September 20, 2007. The Glory Bear shareholders who were part of the Mao Group investors were not on that committee. A report dated August 27, 2007, was prepared for the loan committee by a bank management trainee. The report set forth the loan terms. It listed the repayment sources as the interest reserve, the guarantor, the sale of the property, and refinancing by a construction loan. The report included a summary of guarantor Berry's financial statement. She had an annual income of more than $183,000,

7

annual expenses of more than $92,000, and had interests in four pieces of real property with a combined net value of just over $1 million.

The report to the loan committee also included an analysis of various factors that affected whether the loan should be made. These included: demographic and socioeconomic information about the City of Victorville; the characteristics and location of the property, including its proximity to other businesses and major streets and freeways; rental rates and sale prices for comparable properties; and the backgrounds of both Hsieh and Berry.

The report said the property had appraised at $3.96 million. It said the strengths of the loan proposal were the adequate interest reserve, the high demand for business in the area, the property value and the guarantor's assets were enough to cover the loan, and Hsieh's demonstrated experience at developing other properties. The one weakness noted was the "[g]eneral economic downturn in the area." Based on this, the report recommended that the loan be approved.

Although the August 27 report referred to the property appraisal, the appraisal was actually requested one day later. The appraisal was completed on September 6, 2007. Respondents do not contend, and there was no evidence to show, that the appraisal was inaccurate.

The bank did not do a credit check on either Hsieh or Berry.

D.    Expert Evidence Concerning the Existence of a Conspiracy

There was no direct evidence that the bank conspired with Hsieh and Berry to defraud respondents. Instead, respondents relied on circumstantial evidence as explained by expert witnesses as proof of the bank's intent.

Banking industry expert Burton McCullough testified for respondents that the bank's loan was suspicious for several reasons: (1) the bank did not properly vet either Berry or Hsieh, did not require sufficient protections such as a $250,000 deposit from Berry to back up her guarantee, and Berry had inadequate resources to serve as guarantor; (2) when the loan was made in August 2007 the real estate market was declining so

8

much that no banks were making loans to buy raw land for commercial development; (3) for the same reason banks were not making construction loans, which the bank asserted as a primary source of repayment; (4) the bank did not rely on the property appraisal; (5) the loan amount was about 10 percent of the bank's total assets, making it too risky; (6) the loan fee and interest rate were unrealistically low and amounted to a "sweetheart deal"; (7) a conflict of interest existed because two of the Glory Bear shareholders had a connection to the bank, with one being a shareholder of the bank and the other being married to a bank shareholder; (8) the loan did not require monthly payments of principal, and because of the defects in the how the loan was structured, the bank had no practical means of repayment; and (9) the property was in Victorville, which was outside the bank's targeted geographic area of San Gabriel.

Based on these factors, McCullough concluded that the loan was a "sweetheart deal" made for the benefit of the bank shareholders who were also participating in the Glory Bear investment project.

Respondent's theory of how the bank planned to be repaid for the loan came from expert witness Carl Knudson, a forensic accountant and certified fraud examiner. According to Knudson, after deducting for taxes and other charges, $1,589,800 was transmitted separately to each of the sellers. Although tax documents indicated that the funds were disbursed to foreign nationals, Knudson had no evidence of where those funds eventually ended up. Even so, he concluded that some of it was funneled from Taiwan into accounts that were accessible to two Mao Group investors – Lin Lin Wong and Melanie Mao – and from there were transferred to Glory Bear in order to pay down the loan principal.

The paper trail Knudson relied on was lengthy and confusing. Distilled, he found numerous payments coming from Taiwan into California bank accounts accessible to Lin Lin Wong. The total amount was $527,198.14, which Knudson said was exactly one-third of $1,589,800 – the amount that went to each seller. Two-thirds of the money from Taiwan was used to pay down the loan principal on behalf of Lin Ling Wong and Melanie Mao, Knudson testified.

In short, Knudson believed that money from at least one of the sellers was coming back to two Mao Group investors in order to help pay down the loan principal. He based this on the fact that the sellers lived in Taiwan and funds amounting to one-third of a single seller's proceeds came to Lin Lin Wong's accounts, where two-thirds of that amount was used to pay down the principal. However, Knudson admitted that he had no idea where the sellers' proceeds actually ended up and that the money trail after escrow closed ended in California. He also admitted that he had no idea where the money in Lin Lin Wong's accounts came from and had been unable to connect any of the sale proceeds to any of the Mao Group defendants.

Melanie Mao and Lin Lin Wong testified about the source of most of the funds covered by Knudson' testimony. Wong testified that her stepson and his wife made regular monthly deposits of almost $12,000 as a gift to her in gratitude for a decision by Wong's late husband (and the stepson's father) to let him exploit for commercial purposes a popular Chinese cartoon character that the husband created. Mao testified that funds were deposited by her family in Shanghai into one of the accounts Knudson described after she asked for financial help to prevent the bank from foreclosing on the property.

3.    *The Verdict and Posttrial Motions*

The jury found that Hsieh and Berry had defrauded respondents. They also found that the bank conspired to defraud respondents. However, the jury found that the Mao Group and the architect had not taken part in any fraud. The trial court denied the bank's motion for judgment notwithstanding the verdict, which was based in part on the primary issue on appeal: that there was no substantial evidence that the bank conspired with Hsieh and Berry. The bank also contends that a new trial should be ordered because the verdict exonerating the Mao Group of fraud was inconsistent with the verdict against the bank, and that even if the liability portion of the verdict is affirmed, the damage award of the full amount of respondents' investment was excessive and unjustified because

10

respondents still had their 60 percent share of Glory Bear, which still owned the Victorville property.[4]

## STANDARD OF REVIEW

Under the substantial evidence standard of review, we will affirm the trier of fact's findings if we conclude that a reasonable trier of fact could have found for respondents based on the entire record. (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1282.) This does not require us to "blindly seize any evidence in support of the . . . findings in order to affirm the judgment." (*Ibid.,* citation omitted.) The term "substantial evidence" refers to the quality of the evidence, not the quantity. After reviewing the entire record, we must determine whether there is "evidence of ponderable legal significance that is reasonable, credible and of solid value, supporting the challenged findings of the trier of fact." (*Id.* at pp. 1282-1283.) Although inferences may constitute substantial evidence, they must be the product of "logic and reason emanating from the evidence and not mere speculation or conjecture. [Citation.] It must actually be substantial proof of the essentials the law requires in the particular case. [Citation.]" (*Id.* at p. 1283.)

## DISCUSSION

1. *Elements of A Civil Conspiracy Claim*

A civil conspiracy is not an independent tort. Instead, it is a theory of vicarious legal liability for those who do not actually commit a tort but share the common plan of the direct perpetrators. (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 (*Kidron*).) A plaintiff alleging civil conspiracy must provide substantial evidence of the three elements: (1) the formation and operation of the conspiracy; (2) wrongful conduct in furtherance of the conspiracy; and (3) resulting damages. (*Ibid.*)

---

[4] We need not reach these issues because we reverse on the ground that there was insufficient evidence to support the judgment.

11

"Because civil conspiracy is so easy to allege, plaintiffs have a weighty burden to prove it. [Citation]. They must show that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it. [Citation.] It is not enough that the conspiring officers knew of an intended wrongful act, they must agree – expressly or tacitly – to achieve it." (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 333.) Absent such proof, the independent acts of two or more wrongdoers is not a conspiracy. (*Ibid.*)

Although knowledge and intent may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances, suspicions or mere associations between persons do not make a conspiracy. (*Kidron, supra,* 40 Cal.App.4th at p. 1582.) Instead, there must be evidence of some participation or interest in the commission of the tort, and inferences used to make that showing "must flow logically from other facts established in the action." (*Ibid.*) In other words, bare allegations and rank conjecture are not enough to prove a civil conspiracy. (*Choate, supra,* 86 Cal.App.4th at p. 333.)

2.      *There Was Insufficient Evidence That the Bank Conspired With Hsieh*

The bank contends we should reverse for two reasons: First because there was insufficient evidence that Hsieh and Berry committed fraud; and second, because even if Hsieh and Berry did commit fraud, there was insufficient evidence that the bank either knew about their fraudulent scheme or intended to help them carry it out.

A.      Evidence That Hsieh Committed Fraud to Cash Out His Parents As Owners of the Victorville Property Is Speculative

As to the first, the bank points to the linchpin of respondents' theory – that Hsieh concealed that the Victorville property was owned by his parents and that he duped respondents into investing in the property in order to dump it at a high price before the real estate market collapsed. The bank contends that respondents' fraud theory collapses

12

if there is insufficient evidence that Hsieh's parents were the sellers, meaning that there was no fraud to conspire with.

We agree with the bank that the evidence of ownership by Hsieh's parents is entirely speculative. The sellers' real estate agent testified that the sellers were related to her and were not married to each other, and that Hsieh was not a member of her family. Her testimony was supported by the fact that the seller Hsiehs each took sole and separate half interests in the property when they bought it. It is also supported by their failure to identify themselves as spouses in a confidential information statement they prepared as part of the sale process, and to list different addresses in the same document. Furthermore, as respondents' forensic accounting expert testified, the sales proceeds were divided equally and transmitted separately to each of the sellers, something that would not ordinarily occur with a married couple. Finally, Hsieh denied being related to the sellers and testified that his father died two years before the sale occurred, at which time he assumed his mother's surname.

All of this evidence was uncontradicted. In the absence of other evidence, concluding that the sellers were Hsieh's parents because they had the same last name and because Hsieh moved to California the same year that the sellers acquired the Victorville property is nothing more than speculation based upon mere coincidence.[5] As a result, there was insufficient evidence to support respondents' fraud theory.[6]

---

[5] Respondents make much of the fact that the surname "Hsieh" is the 5,774th most common surname in the United States, occurring at a rate of 1 in 49,020 people. Because Hsieh and the sellers are both from Taiwan, we believe the relevant inquiry is the frequency of that surname in that county. According to internet sources, Taiwan has a population of more than 23 million people. (www.worldpopulationreview.com /population-of-taiwan.) The surname "Hsieh" is the 13th most common surname in Taiwan, occurring in 1.77 percent of the population (www.pinyin.info/news/2008/taiwan-personal-names-a-frequency-list; www.Wikipedia.org/wiki/ List_of_common_Chinese_surnames) and therefore belongs to more than 400,000 people in that nation.

[6] Respondents also contended that Hsieh concealed the fact that the sellers and he had the same last name. However the sellers' names appear on at least two documents

13

We need not reverse solely on the ground that there is no evidence that Hsieh's parents owned the property, however. Respondents rely solely on circumstantial evidence as the basis for the inference that the bank both knew about the fraud and intended to help carry it out. The twin evidentiary pillars supporting these inferences are the testimony of banking expert McCullough that the loan was suspicious and flawed in several regards and that of fraud examiner Knudson that the sellers returned some of the sales proceeds to the bank through two Mao Group investors. Neither rests on solid ground and, as set forth below, the evidence that the bank conspired with Hsieh's supposed fraudulent scheme is equally speculative.

B. <u>Evidence That Money Was Laundered Back to the Bank From the Sellers Was Entirely Speculative</u>

The speculative nature of Knudson's conclusions that the sellers secretly transferred money back to the bank is readily apparent. Although he believed that at least one of the sellers returned one-third of his or her share of the proceeds to the bank through Mao Group investors Lin Lin Wong and Melanie Mao, he admitted that he had no idea where the sales proceeds actually went after they were disbursed from escrow and that he had no idea where the money in Lin Lin Wong's accounts came from and had been unable to connect any of the sale proceeds to any of the Mao Group defendants. Instead, his conclusion rested on the fact that numerous deposits to the bank accounts in question added up to one-third of one seller's sales proceeds, that the Mao Group held a one-third interest in Glory Bear, and that some of those funds were then used to pay down the principal on the loan in order to prevent a foreclosure by the bank.

As the bank points out, some of Knudson's math does not add up. First, the Mao Group held a 30 percent interest in Glory Bear, not a one-third interest. Second, Knudson calculated that $527,198.14 came back from the seller, but that is less than one-third and more than 30 percent. Third, Melanie Mao and Lin Lin Wong's undisputed testimony

signed by respondent Walter Wong: amended escrow instructions dated July 26, 2007, and a contingency removal form dated September 5, 2007.

14

explained that the money in the accounts that they contributed toward paying down the loan principal came from family members.

Even discounting these facts, at bottom Knudson's conclusions are based on nothing more than his speculation that money in the disputed bank accounts came from the sellers because it came from the country where they lived. As a result, there is no substantial evidence to support a finding that the bank took part in the fraud because it knew it would be repaid in part by the sellers essentially laundering part of the sales proceeds back to it through two members of the Mao Group.[7]

C.     The Circumstances Surrounding the Loan Transaction Do Not Permit An Inference That the Bank Conspired With Hsieh

McCullough's testimony concerning the shaky and questionable nature of the loan is subject to the same defects that undermine Knudson's testimony. McCullough testified that the loan was made to accommodate bank shareholders Maxwell Lin, who was married to one of the Mao Group investors, and Li Li Cheng, who was also an investor in Glory Bear. He based this on several factors: (1) the loan was risky because it represented 10 percent of the bank's assets; (2) the loan fee and interest rate were very low; (3) the loan was made at a time when banks were not lending money at all for either land purchases or construction; (4) although the loan did not technically violate federal conflict of interest rules, it still raised a conflict question because two bank shareholders were either directly or by marriage taking part in Glory Bear; (5) there was no real source of repayment; (6) the bank did not rely on the appraisal; (7) the bank did not adequately investigate Berry's fitness to be a guarantor; and (8) the loan was made outside the bank's geographic business area.

---

[7]     As the bank points out, this portion of the conspiracy theory is at odds with the underlying motivation behind the supposed fraud in the first place – to cash out the sellers before property values sank any further. If that was the scheme's purpose, it is hard to understand why the sellers would then agree to return more than $500,000 of the proceeds to anyone.

We begin with McCullough's testimony that the bank did not determine whether Berry had adequate resources to act as a loan guarantor and did not rely on the appraisal.

As to the first, McCullough admitted that the bank's files included some of Berry's tax returns and documents showing the bank did check to see whether Berry was on title to the real property she claimed to own. Respondents do not contend, and there is no evidence to show, that Berry's statements concerning her financial condition or the value of the real properties she owned were false.

As to the second, the documents show some confusion over the timing of the appraisal, with the bank's internal recommendation of August 27, 2007, referring to the appraisal as if it had been completed, when it was not ordered until the next day and was not completed until September 7, 2007. The loan was not approved until September 20, 2007, leaving sufficient time for the bank to review it, however. Respondents contend this did not happen because bank president Huang testified he did not rely on the appraisal, and because an appraisal review checklist was not prepared and signed by the bank until November 28, 2007, after escrow had closed. Both contentions are misleading, however.

Huang testified that the November checklist was prepared to comply with banking regulations in order to certify that certain appraisal procedures were followed in issuing the loan and did not mean the appraisal had not been reviewed earlier. Huang was asked several times by respondents' counsel whether the bank had reviewed and relied upon the appraisal before approving the loan. Huang answered that a bank employee named Julian had done that and that the bank used the appraisal as a reference point – as one of several factors to be considered. He also testified that the bank did not totally rely on the appraisal. Respondents' counsel asked again whether the bank relied on the appraisal "in order to issue the loan." Huang answered no.

Shortly after, while still questioning Huang about the appraisal's date discrepancies, respondent's counsel asked whether bank employee Lui told him an appraisal had come in on the property. Huang answered, "I believe, before we went into the committee meeting, he talk with me that the two of us will decide as to whether this

16

appraisal for the property would be reasonable or not." Counsel then asked, "So you did review the appraisal; is that correct?" Huang answered that "unlike the forms that we talked about . . . earlier, though, rather, we just talk about this property as to what were conditions in the neighboring areas and how much the value of those properties were." When questioned by his own counsel, Huang said he had never noticed the date discrepancy before, that the appraisal was prepared by an independent appraiser, and that it was used by the loan committee.

When Huang's testimony on this subject is read together and in context, it is unfair to conclude that he testified the bank did not rely on the appraisal at all when making its loan decision. Finally, there is no evidence that the appraisal was inaccurate or that the sale price did not represent the fair market value of the property at the time of the sale.[8]

As for McCullough's other points, they can be viewed as confirmation of his opinion that the loan was a "sweetheart deal" meant to accommodate two of the bank's shareholders.[9] However, there is a yawning gap between that conclusion and an inference that the loan was also intended to help Hsieh defraud a group of investors that included the two bank shareholders. Such an inference "does not flow logically" from the facts (*Kidron, supra,* 40 Cal.App.4th at p. 1582), and we can conceive of no reason why the bank would seek to help two of its own shareholders get a loan as an accommodation to them while simultaneously intending to dupe them and numerous other investors into taking the property off of the Hsieh Family's hands so they could cut their losses before property values declined any further.

---

**8**    McCullough relied on the November appraisal review checklist to conclude the bank had not reviewed the appraisal before approving the loan.

**9**    On appeal, respondents contend there is no evidence that Lin and Cheng were in fact shareholders because the record does not include stock certificates in their names. We disregard this contention for two reasons. First, the opinion of their own expert banking witness assumed that they were shareholders; second, even on appeal respondents concede that Lin and Cheng made some kind of investment in the bank, and it makes no difference whether the loan was made to accommodate investors as opposed to actual shareholders.

17

In short, neither the expert testimony of McCullough and Knudson and the evidence upon which they relied permit an inference that they bank either knew of any fraudulent scheme by Hsieh or intended to help him carry one out. As a result, the judgment is reversed.

## DISPOSITION

The judgment against the bank is reversed. Appellant shall recover its costs on appeal.


                                                    RUBIN, J.
WE CONCUR:


        BIGELOW, P. J.


        GRIMES, J.