Filed 12/17/18 (unmodified opn. attached; received for posting 12/28/18)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G055391 |
| v. | (Super. Ct. No. M12456) |
| LAMAR McCLINTON, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

This court hereby orders that the opinion filed herein on November 30, 2018, be modified as follows:

1. On page 1, first full paragraph, first line, the name "Jonathan S. Fish" is deleted and replaced with "David A. Hoffer."

2. On page 21, footnote 12, third line, delete the dash after the citation page number 378.

3. On page 32, footnote 16, "on" is deleted and replaced with "in."

4. On page 38, the line spacing above subheading "*G. Cumulative Error*" should be "at least" at "24 pt."

This modification does not change the judgment. The petition for rehearing is DENIED.

MOORE, ACTING P. J.

WE CONCUR:

FYBEL, J.

THOMPSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LAMAR McCLINTON,<br><br>    Defendant and Appellant. | G055391<br><br>(Super. Ct. No. M12456)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Jonathan S. Fish, Judge. Judgment affirmed. Appellant's request for judicial notice denied.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury found defendant Lamar McClinton to be a sexually violent predator (SVP), as defined within the Sexually Violent Predator Act (SVPA). (Welf. & Inst. Code, § 6600, subd. (a)(1).) [1] The trial court then committed McClinton to the custody of the State Department of State Hospitals (SDSH) for an indeterminate term.

On appeal, McClinton challenges several rulings made by the trial court (before, during, and after the trial). McClinton also makes four instructional error claims, he argues there was insufficient evidence, and he asserts that the SVPA is fundamentally unconstitutional. We disagree and affirm the judgment.


I

PROCEDURAL BACKGROUND

On May 11, 2009, the Orange County District Attorney (the People) filed an SVPA petition. The People alleged that McClinton was convicted: 1) in 1983, of burglary and assault with intent to commit rape; 2) in 1985, of rape by force; and 3) in 1991, of rape by force, oral copulation by force, burglary, and attempted burglary. The People further alleged that McClinton was currently being confined in prison and that two mental health professionals had determined that McClinton "has a current diagnosed mental disorder such that he is likely to engage in criminal, sexually violent predatory conduct without appropriate treatment and custody within the meaning of" the SVPA. [2]

In July 2011, the trial court conducted a two-day probable cause hearing and took the matter under submission. After a series of motions, the court made a finding of probable cause in March 2012; the court ordered McClinton to "remain housed in a

---

[1] Further undesignated statutory references will be to the Welfare and Institutions Code.

[2] The relevant facts will be covered within the sufficiency of the evidence analysis.

secure facility until a trial has been conducted." In June 2013, after an 11-day SVP trial, the court declared a mistrial based on the jury's inability to reach a unanimous verdict.

In July 2017, after a 14-day retrial, the jury found true the allegation that McClinton is an SVP. The trial court subsequently ordered McClinton to be committed to the SDHS for an indeterminate term. The court denied McClinton's motion for conditional release.

II

DISCUSSION

McClinton contends: (A) the trial court improperly permitted the People to retain an SVP expert and improperly allowed the expert to have access to his SDSH records; (B) the court improperly denied his motion to dismiss (based on the delay in getting the matter to a retrial); (C) the court improperly ruled that he could be impeached with his prior trial testimony; (D) the court improperly denied his request for information regarding nontestifying experts consulted by the People; (E) there was insufficient evidence; (F) the court committed four instructional errors; (G) the cumulative effect of the alleged preceding errors requires reversal; (H) the court improperly denied his posttrial motion for conditional release; and (I) the SVPA itself is unconstitutional.

We shall address each of McClinton's contentions. But we will begin with an overview of the statutory framework of the SVPA, which was well described by our Supreme Court in *Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646-648 (*Reilly*):

"The Welfare and Institutions Code outlines the procedure for determining whether a person is an SVP. (§ 6600 et seq.) Under section 6601, whenever the Secretary of the Department of Corrections and Rehabilitation (Department) determines that a person may be an SVP, the secretary refers that person to the Department and the Board of Parole Hearings for an initial screening. (§ 6601, subds. (a)(1), (b).) In

3

screening, the Department considers 'whether the person has committed a sexually violent predatory offense' and reviews 'the person's social, criminal, and institutional history.' (*Id.*, subd. (b).) If the Department determines that the individual is likely to be an SVP, it refers him or her to the [SDHS] for a 'full evaluation.' (*Ibid.*)

"Two mental health experts conduct the full evaluation. The Director of the SDSH (Director) appoints these experts, who must be either psychologists or psychiatrists. (§ 6601, subd. (d).) Each expert 'shall evaluate the person in accordance with a standardized assessment protocol . . . to determine whether the person is a sexually violent predator as defined in [section 6600]. The standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders . . . ,' including 'criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder.' (§ 6601, subd. (c).)

"If both evaluators agree that the person has a diagnosed mental disorder, so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody, the Director forwards a request that a petition for commitment be filed as specified under section 6601, subdivision (i). However, if the evaluators disagree on the individual's SVP status, the Director 'shall arrange for further examination of the person by two independent professionals . . . .' (§ 6601, subd. (e).) At this stage, the petition 'shall only be filed if both independent professionals who evaluate the person pursuant to subdivision (e) concur that the person meets the criteria for commitment specified in subdivision (d).' (§ 6601, subd. (f).) Read together, subdivisions (d), (e), and (f) of section 6601 amount to an unambiguous statutory prefiling requirement 'that a petition for commitment or recommitment may not be filed unless two evaluators, appointed under the procedures specified in section 6601, subdivisions (d) and (e), have concurred that the person currently meets the criteria for commitment under the SVPA.'

4

[Citation.]  Where this initial requirement is not met, the commitment may not proceed.
[Citation.]

"The SVPA also provides for evaluations to be updated or replaced after a commitment petition has been filed.  (§ 6603, subd. (c).)  Section 6603, subdivision (c) was enacted to clarify the right of the attorney seeking commitment to obtain up-to-date evaluations, in light of the fact that commitment under the SVPA is based on a 'current mental disorder.'  [Citations.]  If an updated or replacement evaluation results in a split of opinion as to whether the individual meets the criteria for commitment, the SDSH must obtain two additional evaluations in accordance with subdivision (f) of section 6601.  (§ 6603, subd. (c).)  However, although initial evaluations conducted under section 6601 must agree, a lack of concurrence between updated or replacement evaluations does not require dismissal of the petition.  [Citation.]  Rather, the updated evaluations' primary purpose is evidentiary or informational.  [Citation.]  Mandatory dismissal is not required where one or both of the later evaluators conclude the individual does not meet the criteria for commitment.  [Citation.]"

## A.  Discovery Rulings Regarding SVP Expert Retained by the People

McClinton argues that the trial court improperly permitted the prosecution to retain an SVP expert for the retrial, and improperly allowed that expert to have access to his SDSH records.[3]  We find no abuse of discretion.

### 1.  Legal Principles

SVPA trials "are '"special proceedings of a civil nature."'"  (See *Moore v. Superior Court* (2010) 50 Cal.4th 802, 815.)  Discovery procedures in SVPA proceedings

---

[3] Similar issues are pending before the California Supreme Court in *People v. Superior Court* (*Smith*), review granted May 20, 2015, S225562, argued on October 2, 2018.

are governed by the Code of Civil Procedure. (*People v. Superior Court* (*Cheek*) (2001) 94 Cal.App.4th 980, 989.) Civil litigants generally have the right to retain expert witnesses and to subpoena documents. (See Code Civ. Proc., §§ 2034.210-2034.310 [expert witness information], 1985-1985.8 [subpoena duces tecum]; see also *People v. McKee* (2010) 47 Cal.4th 1172, 1192 (*McKee I*) ["expert testimony is critical in an SVP commitment proceeding"].) We review discovery orders for an abuse of discretion. (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1161.)

A SVPA defendant has a right to privacy in his mental health records, but that right is not absolute. (§ 5328; *People v. Martinez* (2001) 88 Cal.App.4th 465, 478.) A defendant's right to privacy is balanced against the government's "interest in protecting the public from sexually violent predators." (*People v. Allen* (2008) 44 Cal.4th 843, 866.) Further, the justice system has an interest in providing information to assist the trier of fact in determining whether the alleged defendant is, or continues to be, an SVP. (*People v. Leonard* (2000) 78 Cal.App.4th 776, 792-793.)

In 2001, the Supreme Court held that "in an SVPA proceeding . . . the district attorney may obtain access to otherwise confidential treatment information concerning an alleged SVP to the extent such information is contained in an updated evaluation." (*Albertson v. Superior Court* (2001) 25 Cal.4th 796, 807.)

Effective January 1, 2016, the Legislature amended the SVPA, which further addressed discovery procedures to access SDSH records: "Notwithstanding any other law, the evaluator performing an updated [SVP] evaluation shall include with the evaluation a statement listing all records reviewed by the evaluator pursuant to subdivision (c) [updated and replacement evaluations]. The court shall issue a subpoena, upon the request of either party, for a certified copy of these records. The records shall be provided to the attorney petitioning for commitment and the counsel for the person

6

subject to this article.  The attorneys may use the records in proceedings under this article and shall not disclose them for any other purpose."  (§ 6603, subd. (j)(1).) [4]

### 2. *Factual and Legal Analysis*

When the SDSH initially evaluated McClinton in April 2009, one doctor found that McClinton met the SVPA criteria (positive); another doctor found that he did not (negative).  Based on this disagreement, the SDSH arranged for further examinations by Dr. Eric Fox and Dr. William Damon.  Both of these evaluations were positive (met the SVPA criteria), and were the basis of the People's SVPA petition and the trial court's finding of probable cause.  In addendums and updated evaluations in 2010, 2011, 2012, and 2013, Dr. Fox and Dr. Damon continued to make positive SVPA evaluations prior to McClinton's first trial, which ended in a mistrial in June 2013.

In 2014, Dr. Damon completed a fourth updated evaluation, which was negative (did not meet the SVPA criteria), while Dr. Fox's updated evaluation continued to remain positive.  Once again, based on this disagreement, the SDSH arranged for two new SVP evaluators, who also disagreed in their evaluations, Dr. Roger Karlsson (negative) and Dr. Christopher Matosich (positive).  In February 2016, Dr. Matosich changed his evaluation to negative; consequently, as of that date, no SDSH evaluator continued to find that McClinton met the criteria under the SVPA.

In March and April 2016, the People issued subpoenas duces tecum (SDT) to the SDSH seeking the records relied on by Dr. Damon, Dr. Matosich, and Dr. Karlsson in their respective 2016 evaluations.  In May 2016, the trial court denied McClinton's motion to quash the People's SDTs.  In July 2016, the People retained Dr. Kathleen Longwell as an SVP expert.  In November 2016, the court issued an order allowing the

---

[4] Hereinafter referred to without the word "subdivision."

7

People to release McClinton's records to Dr. Longwell. Prior to trial, McClinton filed a motion in limine to exclude Dr. Longwell as an expert witness. The court denied the motion.

We find that the People did not act outside of the scope of the SVPA by retaining Dr. Longwell. Although there were no positive SVP evaluations of McClinton as of February 2016, the People were not required to dismiss the petition. (See *Reilly*, *supra*, 57 Cal.4th at p. 648 ["Mandatory dismissal is not required where one or both of the later evaluators conclude the individual does not meet the criteria for commitment"].) The People elected to proceed to trial; therefore, the hiring of an expert witness was logically permitted within the Code of Civil Procedure, which generally applies in SVPA proceedings. (See *People v. Superior Court* (*Cheek*), *supra*, 94 Cal.App.4th at p. 989.)

Moreover, the recently amended statute—section 6603 (j)—gave the People further—and specific—statutory authority to subpoena McClinton's underlying SDSH mental health records. The statute also gave the People the limited ability to use them at upcoming SVPA proceedings, which would logically include sharing the SDSH medical records with a testifying expert. Thus, we do not find that the trial court abused its discretion in any of its rulings concerning Dr. Longwell's expert SVP testimony, or her access to McClinton's SDSH mental health records.[5]

---

[5] McClinton also argues that the People improperly disclosed his confidential medical records to Dr. Longwell (and other experts that were consulted, but not retained) in violation of the Health Insurance Portability and Accountability Act. (42 U.S.C. § 1320d et seq.) But McClinton made no citations to the record indicating that this issue was ever raised in the trial court. (Cal. Rules of Court, rule 8.204, subd. (a)(1)(C).) Thus, the issue has been forfeited for purposes of appeal. (*Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776-777 [failure to raise issue in the trial court forfeits claim of error on appeal].)

### 3. *Retroactivity Argument*

McClinton argues that section 6603 (j), which became effective on January 1, 2016, was improperly applied retroactively. McClinton argues that the People should only have been allowed to "access treatment records generated in the course of services provided on or after January 1, 2016." We disagree.

Generally, all laws are to be applied prospectively. (*In re Estrada* (1965) 63 Cal.2d 740, 746.) Nonetheless, "a law addressing the conduct of trials still addresses conduct in the future. This is a principle that courts in this state have consistently recognized. Such a statute '"is not made retroactive merely because it draws upon facts existing prior to its enactment."'" (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288.) Rather, the effect of such statutes "'is actually prospective in nature since they relate to the procedure to be followed in the future.' [Citations.]" (*Ibid.*)

Section 6603 (j) clarifies discovery procedures in order to obtain an SVPA defendant's previously existing SDSH medical records (through the use of SDTs), and their subsequent disclosure for purposes of future SVP proceedings. The statute plainly applies to SVP discovery procedures and/or trial proceedings that were to occur after January 1, 2016. In this case, the People's SDTs, the disclosure of McClinton's SDSH mental health records to Dr. Longwell, and the SVP retrial all occurred after January 1, 2016. Thus, section 6603 (j) was applied prospectively, not retroactively.

### 4. *Equal Protection Argument*

McClinton argues that section 6603 (j) gives the People "significant access to the confidential records of alleged SVPs. At present, this exception . . . does not exist for any other recipient of mental health services, including similarly situated mentally disordered offenders (MDOs) and mentally disordered sex offenders (MDSOs). This

9

disparate treatment of SVPs violates federal and state constitutional rights to equal protection under the law." We disagree.

When analyzing equal protection claims: "We first ask whether the two classes are similarly situated with respect to the purpose of the law in question, but are treated differently." (*People v. Lynch* (2012) 209 Cal.App.4th 353, 358.) MDOs and SVPs have been found to be similarly situated in other contexts. (See *McKee* I, *supra*, 47 Cal.4th at p. 1203; see also *In re Calhoun* (2004) 121 Cal.App.4th. 1315, 1351-1352 ["Both have been convicted of a serious or violent felony. At the end of their prison terms, both have been civilly committed to the Department of Mental Health for treatment of their disorders. Furthermore, the purpose of the MDO Act and the SVPA is the same: to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders"].)

In an equal protection review, if the groups are sufficiently similar with respect to the law being challenged, we then ask whether disparate treatment of the groups is justified. (*McKee I*, *supra*, 47 Cal.4th at p. 1207.) "Unless the law treats similarly situated persons differently on the basis of race, gender, or some other criteria calling for heightened scrutiny, we review the legislation to determine whether the legislative classification bears a rational relationship to a legitimate state purpose." (*People v. Moreno* (2014) 231 Cal.App.4th 934, 939.) "However, a law that interferes with a fundamental constitutional right or involves a suspect classification, such as race or national origin, is subject to strict scrutiny requiring a compelling state interest." (*People v. Lynch*, *supra*, 209 Cal.App.4th at p. 358.)

The Supreme Court has identified two types of interests protected by the right to privacy: 1) the right to autonomous decision making, and 2) the right to nondisclosure of intimate personal information (confidentiality). (*Whalen v. Roe* (1977) 429 U.S. 589, 599-600.) The interest in autonomy is recognized as a fundamental right

10

and is thus accorded the utmost constitutional protection; this right involves issues related "to marriage, procreation, family relationships, child rearing and education." (*Id*. at p. 600, fn. 26.) However, confidentiality has not been recognized as a fundamental right. (See *People v. Gonzales* (2013) 56 Cal.4th 353, 385 [disclosing therapy records in SVPA commitment proceedings does not violate a fundamental constitutional right].)

Here, McClinton's equal protection challenge is to section 6603 (j), which concerns access (by both parties) to an SVP defendant's otherwise confidential medical records. To start our analysis, we find that SVPs are similarly situated to MDOs and MDSOs for the purposes of analyzing access to medical records. (See *McKee I*, *supra*, 47 Cal.4th at p. 1203.) Further, under section 6603 (j), the People arguably have a greater level of access to the records of SVPs as compared to MDOs and MDSOs.

We therefore turn to the justification for the disparate treatment of these similarly situated groups. Again, all persons who are civilly committed do *not* have a fundamental right to the privacy of their medical records. (See *People v. Gonzales*, *supra*, 56 Cal.4th at p. 385.) Therefore, we must evaluate McClinton's equal protection challenge under a rational basis test.

Under rational basis review, the legislation is presumptively valid and must be upheld so long as there exists a rational relationship between the disparity of treatment and some legitimate governmental purpose. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-17.) Under this test, the burden is on the party challenging the legislation to demonstrate the absence of any rational connection to a legitimate state interest. (*Ibid*.) Indeed, "'a court may engage in "'rational speculation'" as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record."' [Citation.] To mount a successful rational basis challenge, a party must '"negative every conceivable basis"' that might support the disputed statutory disparity. [Citations.] If a plausible

11

basis exists for the disparity, courts may not second-guess its '"wisdom, fairness, or logic."' [Citations.]" (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.)

Here, the SVPA provides for an indeterminate commitment term, while the MDO and MDSO statutory schemes provide for one-year commitments, which require the People to file a new petition each year if they seek to extend the commitment. (See Pen. Code, § 2960 et seq.; § 6331.)[6] Accordingly, the three different statutory schemes make minor distinctions concerning the People's access to the committed person's medical records. As to MDOs, the relevant statute provides that: "If requested by the district attorney, the written evaluation shall be accompanied by supporting affidavits." (Pen. Code, § 2970, subd. (a).) As to MDSOs, the former statute provided that the hospital director "may submit such supporting evaluations and case file to the prosecuting attorney who may file a petition for extended commitment in the superior court which issued the original commitment." (Pen. Code, § 6316.2, subd. (b), repealed by Stats. 1981, ch. 928, § 2, p. 3485.) And, as we have already discussed, when it comes to updated SVP evaluations, the amended SVPA statute provides that both parties may issue subpoenas, and obtain "all records reviewed by the evaluator" and that both parties' "attorneys may use the records in proceedings under this article and shall not disclose them for any other purpose." (§ 6603 (j)(1).)

In sum, we find that the relatively minor distinctions in the level of access given to the SDSH medical records of persons committed as either an MDO, an MDSO, or an SVP appear to be rationally related to each statutory scheme. Because an SVPA commitment is indefinite and not subject to annual review, it is rational to allow for updated evaluations. Further, it is rational to allow both parties to have access to the

---

[6] The MDSO laws were repealed effective January 1, 1982, but persons committed before that date may remain committed as an MDSO, subject to continuing jurisdiction under the now-repealed statutes. (*Baker v. Superior Court* (1984) 35 Cal.3d 663, 667.)

underlying medical records, primarily for informational and evidentiary purposes.  (See *Reilly*, *supra*, 57 Cal.4th at pp. 647-648.)  Thus, we find that section 6603 (j) does not violate McClinton's constitutional right to equal protection under the law.

## B.  Denial of McClinton's Due Process Motion to Dismiss for Lack of Speedy Trial

McClinton argues that the trial court erroneously denied his due process motion to dismiss the SVPA petition "in light of the 16-month delay of his trial for purposes of affording [the People] the ability to retain and prepare a paid expert for trial." (Original capitalization and boldfacing omitted.)  We find no abuse of discretion.

### 1.  Legal Principles

A trial court has inherent authority to dismiss an SVPA petition for an unreasonable delay in getting the matter to trial.  (*People v. Evans* (2005) 132 Cal.App.4th 950, 956-957.)  We review the denial of such an order under for an abuse of discretion.  (*Ibid*.)  "Where a trial court has discretionary power to decide an issue, we are not authorized to substitute our judgment for that of the trial court.  [Citation.] Reversible abuse exists only if there is no reasonable basis for the trial court's action, so that the trial court's decision exceeds the bounds of reason.  [Citations.]" (*Sanchez v. City of Los Angeles* (2003) 109 Cal.App.4th 1262, 1271.)  Generally, "we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

The SVPA itself does not contain statutory trial deadlines.  (*Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156, 1170-1171 (*Litmon I*).)  Nevertheless, "'the "fundamental requirement of due process"—"the opportunity to be heard 'at a meaningful time and in a meaningful manner'"'" applies in the context of SVPA

13

proceedings.  (*People v. Litmon* (2008) 162 Cal.App.4th 383, 396.)  "The inquiry 'necessitates a functional analysis of the right in the particular context of the case' since the right to a speedy trial is relative."  (*Id.* at p. 398.)

The Supreme Court has explained the criteria by which the due process speedy trial right is to be judged.  (*Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*).) [7]  In *Barker*, the Supreme Court announced a "balancing test, in which the conduct of both the prosecution and the defendant are weighed."  (*Id*. at p. 530.)  This test "compels courts to approach speedy trial cases" balancing four factors: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. (*Ibid.*)  No one factor is necessary or sufficient to the finding of a due process violation. (*Id*. at p. 533.)  "Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  (*Ibid.*)

### 2.  Purported Delay Period (*roughly from March 2016 to June 2017*)

In March 2016, the People informed the trial court that all of the SDSH evaluations were negative, and McClinton stopped waiving time for the retrial.  The People requested that the trial date, which had previously been set for April 11, be continued to September to retain an expert and "have a report created by the People's

---

[7] We agree with the Attorney General that *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*), does not provide an appropriate alternative test.  The *Mathews* due process test involves a cost-benefit analysis.  (*Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1035.)  The *Mathews* test is more properly utilized when there is a facial challenge to a generalized governmental practice or statutory scheme, rather than a challenge concerning the circumstances of delay in an individual case.  (See, e.g., *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212-213 [*Mathews* test utilized in analyzing due process challenge to county's practice of revoking charter schools]; *California Teachers Ass'n. v. State of California* (1999) 20 Cal.4th 327, 348-350 [*Mathews* test utilized in analyzing due process challenge to statute requiring teachers to pay half of costs for administrative law judge].)

14

expert, including an interview with Mr. McClinton, have everything discovered over to the Public Defender's Office . . . so that we can go to trial finally on this case." McClinton's counsel said, "I do believe what would be reasonable in regards to this matter is setting a trial date for July. Obviously, my client is not waiving time because he believes his case should be dismissed." The court found good cause for a continuance and set the matter for trial in July.

In April 2016, the People issued an SDT for McClinton's SDSH medical records. McClinton filed a motion to quash and the People filed an opposition. In May, the prosecutor told the court that "I'm trying to get the records, and have been, so that I can then try and retain an expert immediately so that I can have a report written so that I can comply with the expert discovery deadlines so that we can go to trial." The court denied the motion to quash and found good cause for a continuance and set the matter for trial in August.

By June 2016, the People had received the subpoenaed medical records. Using these records, the People compiled a "hypothetical" that they used to retain an expert witness for trial.[8] In July, the People retained Dr. Longwell as an SVP expert. The People notified McClinton and attached a required declaration. (Code Civ. Proc., § 2034.260.) In July and August, McClinton filed motions to exclude Dr. Longwell as an expert witness, and to preclude her from obtaining confidential information and from performing a mental examination; the People filed responsive motions. In August, the court set the matter for trial in November.

---

[8] We deny McClinton's request for judicial notice of the "hypothetical." There is no indication in the record that the trial court ever admitted the document into evidence, or relied on it in any of its rulings. (See *Towns v. Davidson* (2007) 147 Cal.App.4th 461, 473, fn. 3 [a court need not take judicial notice of irrelevant material].)

In September, the hearing on the pending motions was continued. In October, McClinton represented that the prosecutor had withdrawn his motion for a compelled examination. The court said that it had "received a great deal of paperwork" concerning equal protection arguments and "will need more time to be prepared and to respond." The court vacated the existing trial date and set it for January 2017. In November and December, the court held hearings and ruled on several discovery matters related to Dr. Longwell.

In January 2017, Dr. Longwell met with McClinton at Coalinga State Hospital and he refused to be interviewed. A few days later, McClinton's counsel told the trial court that she had just received Dr. Longwell's evaluation and had therefore not had an opportunity to depose her; however counsel told the court, "My client is not waiving time your honor." The court found good cause and continued the trial date to February. Later in January, McClinton filed additional motions to exclude Dr. Longwell as a witness and additional motions relating to discovery. The court found good cause to continue the trial date until April 10, 2017.

In February, Dr. Damon completed an updated evaluation. In March, the People deposed Dr. Damon. McClinton filed a motion to dismiss based on an alleged due process delay (*Litmon* I, *supra*, 162 Cal.App.4th 383), and a motion to shorten the time to hear the motion.

In April, the People filed a motion to continue the trial for one week to depose an additional witness. The trial court found good cause and continued the motion to dismiss and the trial date. The matter was assigned for jury trial to the Honorable Judge David A. Hoffer. The court heard several motions in limine. McClinton moved to continue the trial date until June in order to litigate the motion to dismiss and because of witness issues. The court granted the motion and set the motion to dismiss to be heard in May and set the trial date for June.

In May, McClinton again moved to continue the motion to dismiss. The court granted the motion and set the hearing for June.

### 3. *The Trial Court's Ruling*

On June 9, 2017, the trial court held a hearing on the motion to dismiss based on speedy trial grounds after it had "reviewed the motion carefully." The court said: "The issue here is whether the defendant's due process rights were violated by the delay ever since he's been declaring himself ready for trial."

The trial court analyzed the "length of the delay[]" factor, in part, as follows: "The fact is that the matter has been actively pursued and litigated. This is not something where . . . there was a petition filed and then a hung jury and then no one moved forward to set this case for trial. It's been set many times, and there's been an immense amount of litigation during the period that the defense is concerned about." The court said, "It's been incredibly active. Really what happened here is the [16 month] delay occurred because all four state evaluators were a negative, and this required the People to hire a new expert. That is an incredibly time-consuming process. You need to subpoena all the records . . . and then a hypothetical needs to be developed. And those subpoenas are always met with motions to quash. And . . . there are technical issues and there are privacy rights at issue. So these are not the kind of subpoenas that are going . . . to proceed without litigation."

The trial court examined the "reason for the delay[]" factor, in part, as follows: "Also, the court needs to look at the *reason for the delay*. And, as I said, the reason for the delay is . . . that the People did actively pursue prosecution in this case." (Italics added.) The court said this "is a long process. I think that the court setting the trial originally in July was unrealistic. It takes a long time to do this because, as I said, records need to be marshaled, then hypotheticals need to be developed. Takes a while to

17

hire the expert because lots of experts need to look at these hypotheticals. They've all got busy schedules. And that person needs to be brought up to speed once that person is hired. And that takes time." The court noted that: "What I do think overall, the court does need to make an evaluation. And overall I think the People have actively pursued the prosecution in this petition."

The trial court evaluated the "defendant's assertion of his rights" factor as follows: "The -- court needs to look at the *defendant's assertion of his rights* under the *Barker* test, and I think he has asserted those rights since I believe March of 2016, but, as I said, I think that that's diminished somewhat by the fact that he's asserted a number of constitutional rights and many of those rights have required delays. I think it makes sense for him to assert those rights in the way that he did, but that is a choice. And those rights can be preserved by a simple objection at the time of the expert's testimony. [I] think it's a good strategic choice and it makes sense, but that's a strategic choice that counsel made." (Italics added.)

The trial court considered "the prejudice to the defendant" factor, in part, as follows: "And, finally, I need to look at the *prejudice to the defendant*. Boy, this one militates strongly to the People. The delay has -- well, first of all, we got to the point where there are now four negatives." (Italics added.) The court said that "there have been new cases that have changed the hearsay rules when it comes to the testimony of experts. I think that those hearsay rules basically force the experts to testify to what they relied upon but do not permit the experts to get into details . . . that could have been brought before the jury [,but] are not allowed anymore . . . ."[9] The court also mentioned

---

[9] The court appears to be referring to *People v. Sanchez* (2016) 63 Cal.4th 665. This intervening case generally holds that when an expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, those statements are hearsay. (*Id*. at p. 686.)

18

the "*Curlee*" case "that's certainly endorsed to the defendant's benefit.[10]  The court added "that the older the defendant is, the older he represents himself to the jury, the more likely the jury -- that he is going to be in a position where he's seen as not being able to offend again.  And I don't think that that hurts him."  The court said:  "I understand . . . that there's always prejudice because somebody's basically kept in custody against their will.  I get that, but, as I said, I'm looking at the legally -- at the legal status of the case when it goes to trial, and I think that has improved for the defendant."

The court decided:  "So on balance . . . I don't think defendant's [constitutional] rights were . . . violated in this instance.  It really does require a case-by-case evaluation, and on the facts of this case, I'm going to deny the motion."

### 4. Legal Analysis

It is readily apparent that the trial court applied the correct legal test and carefully considered each of the four factors.  (See *Barker*, *supra*, 407 U.S. 514.)  Other trial judges may not have reached the same conclusion.  But based on this record, we cannot possibly surmise that the court's denial of McClinton's motion exceeded the bounds of reason or was in any manner arbitrary or capricious.  (See *People v. Goldsmith*, *supra*, 59 Cal.4th at p. 266.)  There was no abuse of discretion; thus, we affirm the court's denial of McClinton's due process (speedy trial) motion to dismiss.

McClinton argues that "most of the . . . delay . . . was due to the state's actions, not the defense."  That may be a correct factual statement, but the trial court appears to have appropriately weighed that fact, among many others, within its analysis.

---

[10]  The court appears to be referring to *People v. Curlee* (2015) 237 Cal.App.4th 709 (*Curlee*).  This intervening case generally holds that petitioners accused under the SVPA are similarly situated to persons found not guilty by reason of insanity (NGI) for purposes of privilege not to testify at commitment hearings.  (*Id.* at pp. 721-722.)

19

McClinton also argues that: "By the court's reasoning, any delay in an SVP trial could not be prejudicial because defendant will age and therefore get the benefit of his prolonged pre-trial commitment in defending against that commitment." We disagree. The trial court's comments regarding McClinton's age do not appear to be dispositive as to the prejudice factor. Again, given its comprehensive analysis, the court appears to have appropriately weighed a multitude of facts.

Finally, McClinton argues that "there was a 16-month delay . . . to do something [retaining an expert] not even contemplated by the SVPA." But again, the People were not required to dismiss the SVPA petition in the absence of positive evaluations by SDSH evaluators. (See *Reilly*, *supra*, 57 Cal.4th at p. 648 ["Mandatory dismissal is not required where one or both of the later evaluators conclude the individual does not meet the criteria for commitment"].) Therefore, having opted to proceed to trial, the People were logically obligated to retain an expert, which—as the trial court discussed at length—necessitated a delay in McClinton's retrial.[11]

## C. Evidentiary Ruling Regarding Impeachment Evidence

McClinton argues that the trial court denied him "due process by ruling that if he testified in his second SVP trial he could be impeached with the content of his

---

[11] McClinton referred us to *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36, 56-83, in a letter filed just prior to oral argument. In that case, there was a 17-year delay in bringing an alleged SVP to trial. During that time, the Los Angeles County Public Defender's Office repeatedly announced it was unavailable for trial. The public defender admitted that its office did not have funding sufficient to adequately represent SVPs and the appellate court found that this constituted a due process violation. (*Ibid.*) There is no indication of comparable facts—or a comparable delay—in this case.

compelled testimony during the first SVP trial." (Original capitalization and boldfacing omitted.) We find no abuse of discretion.[12]

We review a trial court's evidentiary rulings for an abuse of discretion. "Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717–718.) We consider the factual basis of the ruling. (*Johns v. City of Los Angeles* (1978) 78 Cal.App.3d 983, 998 [consideration of the evidence "is essential to a proper exercise of judicial discretion"].) We also consider the legal underpinnings. (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [a court's discretion must be applied within "the confines of the applicable principles of law"].)

Under the federal Constitution, a person may not "be *compelled* in any criminal case to be a witness against himself." (U.S. Const., 5th Amend., italics added.) "The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony." (*Oregon v. Elstad* (1985) 470 U.S. 298, 306-307.) However, a defendant's *compelled* statements may be used for purposes of impeachment. (See *Harris v. New York* (1971) 401 U.S. 222, 225 ["Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury"].)

"It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any *involuntary* statement obtained by a law enforcement officer from a criminal suspect by coercion." (*People v. Neal* (2003) 31 Cal.4th 63, 79, italics added.) *Involuntary* statements cannot

---

[12] The Attorney General argues that McClinton has forfeited this claim on appeal because he did not take the stand in the retrial and subject himself to possible impeachment. (See *People v. Collins* (1986) 42 Cal.3d 378-, 383-388.) McClinton argues that there is an exception to this forfeiture rule. (See *People v. Brown* (1996) 42 Cal.App.4th 461, 471.) We will assume—without deciding—that the issue is properly preserved for appeal.

be used for any purpose, including impeachment. (*People v. May* (1988) 44 Cal.3d 309, 328-329.) "Whether a statement is voluntary depends upon the totality of the circumstances surrounding the interrogation." (*People v. Smith* (2007) 40 Cal.4th 483, 501.) "'A finding of coercive police activity is a prerequisite to a finding that a confession was *involuntary* under the federal and state Constitutions. [Citations.] A confession may be found *involuntary* if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.'" (*People v. Perdomo* (2007) 147 Cal.App.4th 605, 614-615, italics added.)

Formerly, it was well established that the People were legally entitled to compel an alleged SVP to be a witness in his or her trial. (See, e.g., *People v. Leonard* (2000) 78 Cal.App.4th 776, 793 [an SVPA trial is not a criminal case and a defendant's "participation enhances the reliability of the outcome"].) As we discussed, this principle changed in 2015. (*Curlee*, *supra*, 237 Cal.App.4th 709.) In *Curlee*, the appellate court held SVPs and NGIs are similarly situated for purposes of being compelled to testify at commitment hearings. (*Ibid*.) However, the court concluded the record was inadequate to determine if there was a justification for the disparate treatment. (*Id*. at p. 721.) Thus, the court remanded the matter for an evidentiary hearing. (*Id*. at p. 722.)

Here, the People called McClinton to testify as a witness against himself in in his first SVP trial in 2013. Prior to the retrial, McClinton filed a motion to preclude the People from again calling him as a witness, and to strike and seal his prior testimony. At the hearing on the motion, the People stated that they did not intend to call McClinton as witness, nor did they intend to make an evidentiary showing regarding equal protection. (See *Curlee*, *supra*, 237 Cal.App.4th at p. 722.) However, the People argued that if McClinton chose to testify they would attempt to impeach him with any prior inconsistent statements "because it goes directly to his veracity." The People conceded that McClinton's prior SVP trial testimony was "compelled," but they argued that the

22

testimony was not "involuntary" for impeachment purposes. The prosecutor stated: "*Compelled* means he's required to get on the stand, and he was, and he swore an oath and he answered the questions. *Involuntarily* obtained statements are when some type of coercion, force, threats of force are being used. None of that took place." (Italics added.)

The trial court ruled that if McClinton "testifies, he can be asked about previous statements that he made under oath. Those statements were taken . . . in accordance with existing law. It's true that they ultimately were found to violate the defendant's equal protection rights, but they were not found to be the same as . . . involuntary statements." The court said that "it seems to me that the closest analogy is to statements taken in violation of somebody's *Miranda* rights where they're not provided their 5th Amendment rights before they make a statement to the police.[13] Those can be used for purposes of impeachment if in fact the testimony is contrary, and therefore, the court is going to deny the part about striking and sealing the prior testimony."

We agree with the trial court's legal analysis. There is a distinction between a witness's "compelled" statements, which can be used for purposes of impeachment, and a witness's "involuntary" statements, which cannot be used for any purpose. McClinton's testimony at his first SVP trial was "compelled" because he was called as a witness by the People. Although McClinton's testimony was not "voluntary" in the colloquial sense, McClinton's testimony was "voluntary" within the context of due process concerns. That is, there was no showing that McClinton's prior SVP trial testimony was the product of coercion, threats, violence, or the like.

To conclude, we find no abuse of the trial court's discretion in its evidentiary rulings. The court properly allowed the People to impeach McClinton with his prior SVP trial testimony (had he chosen to testify at the retrial).

---

[13] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

23

*D. Nontestifying Experts Consulted by the People*

McClinton argues that the trial court erroneously denied his "request under *Brady* for information regarding [nontestifying] experts consulted by the prosecution."[14] (Original capitalization and boldfacing omitted.) We disagree.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) A *Brady* claim presents a mixed question of fact and law. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.) Accordingly, in *Brady* matters, we defer to the trial court's factual findings that are supported by substantial evidence, and we review the court's application of the law to the facts de novo. (*Ibid.*)

There are three elements to a *Brady* claim. (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1043.) First, the evidence at issue must be *favorable* to the accused, either because it is exculpatory, or because it is impeaching. (*Youngblood v. West Virginia* (2006) 547 U.S. 867, 870.) Second, the evidence must have been *suppressed* by the state, either willfully or inadvertently. (*Brady*, *supra*, 373 U.S. at p. 87.) And third, there must be *prejudice*; meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (*United States v. Bagley* (1985) 473 U.S. 667, 682.)

Generally, a prosecutor (or a defense attorney) is not statutorily required to disclose material that constitutes attorney work product. (See Pen. Code, § 1054.6 ["Neither the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in . . . the Code of Civil Procedure"].) "The opinions of experts who have not been designated as trial witnesses are protected by

---

[14] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

24

the attorney work product rule.  [Citation.]  Their identity also remains privileged until they are designated as trial witnesses." (*Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 297.)

Nevertheless, a prosecutor has a constitutional duty to reveal exculpatory evidence—including otherwise privileged work product—under *Brady* principles.  (See *People v. Collie* (1981) 30 Cal.3d 43, 59, fn. 12; see also, e.g., *United States v. Olsen* (9th Cir. 2013) 704 F.3d 1172, 1181 [contents of internal investigation were favorable to the defendant].)  However, a prosecutor's work product is not discoverable under *Brady* unless the material contains underlying exculpatory *facts*.  (See, e.g., *Morris v. Ylst* (9th Cir. 2006) 447 F.3d 735 [report containing statement of prosecutor's *opinion* regarding whether defendant's girlfriend testified truthfully did not constitute *Brady* material; see also *Hickman v. Taylor* (1947) 329 U.S. 495, 511 [distinguishing between *opinions* expressed in attorney work product and *facts* disclosed in attorney work product].)

Here, McClinton filed a motion asking the trial court to order the People to "turn over all *Brady* material."  (Original capitalization and boldfacing omitted.)  At the hearing on the motion, McClinton noted that after the People received McClinton's medical records "a hypothetical was created, multiple potential experts were contacted and ultimately Dr. Longwell was retained."  McClinton argued that the People needed to disclose "who they contacted, what they gave them, and what the response was."

The People responded that as far as SVPA proceedings:  "*Brady* does not apply."  In the alternative, the People argued:  "They have everything.  They have everything that the People have.  So if the People created a hypothetical and in theory went to a potential expert with that hypothetical, and for whatever reason didn't move forward with that expert, I don't see how that would have any bearing on what discovery would go to respondent.  They're not entitled to the work product and legal reasoning of

the opposing counsel as far as moving forward towards trial. That's trial strategy. . . . [T]hey aren't entitled to that."

The court ruled, "I'm going to deny the motion. I don't think *Brady* does apply in this context, but even if it did apply, it . . . wouldn't apply to what the defense is seeking. The defense is seeking information about any other experts that the People consulted with in . . . trying to hire or retain an expert to provide an opinion in this case. I don't think that that's . . . *Brady* material. . . . It is clearly work product . . . . It is an opinion of an expert that was consulted at most." The court went on to say that: "Everything relevant to form an opinion was provided to [McClinton], and [he] has hired multiple experts to testify that [he] does not meet the criteria of the SVP Act." The court said that "it would be *Brady* material if the People were retaining information about the defendant's history . . . but that's not what's going on here." The court distinguished expert opinions from "facts that are used in making those opinions. Those facts have been provided to the defense."

We generally agree with McClinton that a prosecutor's *Brady* discovery obligations logically apply in SVPA proceedings. This is because civil commitment proceedings fundamentally involve a deprivation of liberty comparable to criminal proceedings. However, there appear to be no published California opinions that specifically speak to this precise issue. (Compare *United States v. Edwards* (E.D.N.C. 2011) 777 F.Supp.2d 985, 990 [federal district court held the *Brady* rule applies to federal civil commitments of sexually dangerous persons].)

Nevertheless, the trial court found that the People did not violate their *Brady* discovery obligations in this case. According to the court, the People disclosed the hypothetical to McClinton before the retrial.[15] Further, as far as any information

---

[15] In the request for judicial notice of the hypothetical, McClinton's appellate counsel also stated that he "obtained a copy" from McClinton's trial counsel.

concerning any nontestifying experts (doctors other than Dr. Longwell) consulted by the People—as well as their opinions regarding McClinton's SVP status—the court was also undoubtedly correct that this information was protected from disclosure under the attorney work product doctrine. (See Pen. Code, § 1054.6; Code Civ. Proc., § 2018.030.) The court correctly distinguished expert opinions from the *facts* used in making those opinions. (See *Hickman v. Taylor, supra,* 329 U.S. at p. 511.) That is, there is no indication that the People withheld from McClinton any exculpatory *facts*.

Thus, the trial court did not commit error when it denied McClinton's request for information regarding any nontestifying experts consulted by the People.

## E. Sufficiency of the Evidence

McClinton argues that jury's finding "must be reversed because there was insufficient evidence that [he] qualified for commitment" under the SVPA. (Original capitalization and boldfacing omitted.) We disagree.

When a jury's factual finding is challenged on appeal, we review the record under the highly deferential substantial evidence standard of review. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489.) If we find substantial evidence we must uphold the jury's finding, even if we would have made a different decision. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) Substantial evidence "is not synonymous with 'any' evidence," the evidence must be "reasonable, credible and of solid value." (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1282-1283.) However, "the testimony of a single witness may be sufficient" to sustain the verdict. (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 589.) The opinion of an expert witness generally constitutes substantial evidence. (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.)

27

When conducting a substantial evidence review, we look at the whole record in a light most favorable to the judgment, we resolve all evidentiary conflicts in favor of the decision of the jury, and we draw all reasonable inferences in favor of the jury's determination. (*CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 787.) "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

In order to sustain the jury's factual finding as to an SVPA defendant, we need to find substantial evidence supporting each of the following four elements: "1. He has been convicted of committing sexually violent offenses against one or more victims; [¶] 2. He has a diagnosable mental disorder; [¶] 3. As a result of that diagnosed mental disorder, he is a danger to, the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior; [¶] AND [¶] 4. It is necessary to keep him in custody in a secure facility to ensure the health and safety of others." (CALCRIM No. 3454.)

### 1. Sexually Violent Offenses Against One or More Victims

The People submitted court records showing that McClinton was convicted of the following offenses: 1) in 1976, of assault with intent to commit rape; 2) in 1983, of burglary and assault with intent to commit rape; 3) in 1985, of rape by force; and 4) in 1991, of rape by force, oral copulation by force, burglary, and attempted burglary. Each incident involved a separate victim.

As to the 1991 convictions, Tammy C. (Tammy) testified that after she went to bed on October 16, 1989, she "was woken up with a hand covering my mouth and told to be quiet." Tammy's three children (ages three, four, and six) were with her at

28

the time.  McClinton, a stranger, raped her "for a long time."  Tammy's youngest child was with her in the bed, and at one point McClinton "kicked my daughter" and "she started screaming."  At this point, McClinton "jumped up" and then Tammy got up as well, but McClinton "pushed me back down and told me that he would be back for me."

About a month later, Tammy was again at her home with her children, but on this night her boyfriend was with her.  At one point, she heard some noise.  Tammy's boyfriend grabbed his gun and ran to the kitchen.  Tammy heard him saying to McClinton, "'You son of a bitch.'"  Tammy heard the gun firing and her boyfriend yelling for her to call the police.

### 2. *Diagnosed Mental Disorders*

Dr. Longwell testified that she is a licensed psychologist in private practice, but she had formerly worked as an SVP evaluator with the SDSH.  Dr. Longwell had completed approximately 3,000 SVPA evaluations over a 20-year period.  She had testified as an SVPA expert approximately 300 times.  According to the latest statistics, her initial evaluations were 13 percent positive (a finding that the inmate is an SVP).

Dr. Longwell said that after she was retained by the People, and reviewed the hypothetical and the records she had been provided, she met with McClinton at Coalinga State Hospital.  McClinton did not agree to be interviewed; McClinton told Dr. Longwell that he did not believe that he would receive a fair evaluation.  Thus, Dr. Longwell based her opinions solely on the documents she had been provided.

Dr. Longwell opined that McClinton "had four diagnosed mental disorders that would qualify him as defined in the SVP statute that predisposed him to the commission of future sexually violent offenses by impairing his emotional volitional controls."  Dr. Longwell found that McClinton had:  i) a paraphilic disorder (forced sexual behavior with nonconsenting adults); ii) antisocial personality disorder (history of

29

law violations, deceitfulness, impulsivity, aggressiveness, reckless disregard for the safety of others, irresponsibility, and lack of remorse); iii) alcohol use disorder; and iv) stimulant use disorder.

   *3. Likelihood of Engaging in Sexually Violent Predatory Criminal Behavior as a Result of Diagnosed Mental Disorders*

   Dr. Longwell testified that paraphilic and antisocial personality disorders tend to be lifelong conditions. The paraphilic disorder affects McClinton's emotional and volitional ability such that it predisposes him to commit sexually violent criminal acts. McClinton's antisocial personality disorder also "predisposes him to commit future sexually -- sexually violent and predatory acts -- criminal acts." The two diagnosis together compound and aggravate each other. As far as the alcohol use disorder, Dr. Longwell testified that "most . . . alcohol abusers or intoxicated people do not sexually assault anyone. However, when you already have the underlying sexual deviance disorder, the drinking . . . can make it more imminent that you will act on those deviant sexual urges . . . because you will be disinhibited because of being under the influence." As far as McClinton's stimulant use disorder, it tends to be a contributing factor to the paraphilic and antisocial personality disorders.

   Dr. Longwell testified that she used four "actuarial instruments" in estimating the statistical probability or likelihood of McClinton committing another sexually violent and predatory offense: the Static-99R (revised), the Static-2002R (revised), the Violence Risk Appraisal Guide-R (revised), and the PCL-R. Dr. Longwell said that "when you take them in a whole, . . . they're fairly consistent as far as being what we would consider a substantial risk of another sexually violent offense."

### 4. *Necessity of Secure Facility for the Health and Safety of Others*

In considering all of the evidence concerning the likelihood of McClinton engaging in future sexually violent predatory criminal behavior, Dr. Longwell testified that McClinton "is likely to commit another sexually violent and predatory offense based on his diagnosed mental disorders at this point in time without appropriate treatment -- treatment and custody."

### 5. *Legal Analysis*

Again, our task is to review the trial record to determine whether it contains substantial evidence to support each of the four elements under the SVPA. (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 351-352.) The testimony of Dr. Longwell is obviously contained in the record. Expert testimony is the type of evidence routinely relied upon by the finder of fact under the SVPA. (See *McKee I*, *supra*, 47 Cal.4th at p. 1192 ["expert testimony is critical in an SVP commitment proceeding"].) McClinton's prior sexual offenses were uncontested, and Dr. Longwell's testimony supports each of the remaining three elements. Thus, we find substantial evidence to support the jury's determination that McClinton is an SVP within the meaning of the SVPA.

McClinton argues that "all of the [SDSH] experts agreed that" he "did not qualify for commitment." At trial, McClinton presented the testimony of two of the four SDSH experts, Dr. Will Damon and Dr. Richard Romanoff. Dr. Damon opined that McClinton did not suffer from a current qualifying mental disorder or present a serious risk of reoffending. Dr. Romanoff similarly opined that McClinton did not suffer from a current mental disorder that qualified him for commitment. Dr. Michael Montrief testified that McClinton had completed 25 different treatment sessions while at Coalinga State Hospital. Dr. Brian Abbott challenged Dr. Longwell's diagnosis and opinion; Dr. Abbott said that Dr. Longwell's opinion could not be considered current because she

31

failed to consider any records or events in the 15 months prior to trial. Dr. Howard Barbarbee challenged the validity of the actuarial tests relied on by Dr. Longwell and said that the risk of a man over the age of 70 reoffending was close to zero percent.[16]

McClinton argues that only evidence in support of his commitment "was the opinion given by the People's retained expert, Dr. Longwell." McClinton argues that: "Damon, Romanoff, and Montrief spent substantial time with [him] and members of his treatment team." Thus, he argues that "Longwell's opinion was not based on any of that material . . . ." He argues that because Dr. Longwell's testimony was only based on her historical review of his (at least 15-month old) medical records, "Longwell's testimony cannot be considered substantial evidence of [his] condition at the time of trial."

It appears that McClinton may somewhat misapprehend our role as an appellate court. We are not going to reweigh these competing arguments; they were all presented to the jury. Our task is narrow. Having found substantial evidence to support each of the four elements under the SVPA, we must affirm the jury's factual finding.

*F. Instructional Error Claims* (4)

Generally, our standard of review for instructional error is de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We determine whether the trial court fully and fairly instructed the jury on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) We consider the instructions taken as a whole; we also presume jurors are intelligent people capable of understanding and correlating all of the instructions they were given. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, overruled on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

---

[16] McClinton was born on November 1945; he is currently 73 years old.

"'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) The ultimate question is whether there is a reasonable likelihood the jury applied the instructions that were objected to in an impermissible manner. (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1220.)

McClinton argues that the trial court erred by giving a special instruction requested by the People, and by refusing to give, or to modify, three other instructions based on his requests.

*1. Unanimity*

McClinton argues that the trial court committed instructional error by giving the jury a special instruction requested by the People: "[T]he 'law does not require that all twelve jurors agree on which specific mental disorder respondent suffers from in this case.'" We disagree.

McClinton bases his argument on the unanimity rule applicable in criminal proceedings. The unanimity rule provides that "[w]here the evidence shows that several criminal acts may have been committed and the defendant is not charged separately with a violation of all those acts, the trial court is required, sua sponte, to instruct the jurors that they must unanimously agree beyond a reasonable doubt upon the particular act constituting the crime. [Citations.] The purpose of this rule is to insure that all jurors agree beyond a reasonable doubt that one particular act or acts constitute the crime charged. [Citations.]" (*People v. Washington* (1990) 220 Cal.App.3d 912, 915.)

A jury's verdict must be unanimous, but unanimity is not required as to each element of an SVP finding. (*People v. Carlin* (2007) 150 Cal.App.4th 322, 347.) "An SVP proceeding is civil, not criminal, and the unanimity requirement for an SVP proceeding is established by statute. [Citation.] Under the SVPA, the jury must

33

determine whether the requirements for classification as an SVP have been established 'beyond a reasonable doubt' and the jury's *verdict* must be unanimous. [Citations]." (*Ibid.*) Nevertheless, whereas the jury's verdict must be unanimous, "[t]here is no statutory requirement regarding unanimity for each subpart of the SVP determination." (*Id.* at p. 347 [rejecting claims that the trial court erred in failing to instruct the jurors that they must unanimously agree on which prior convictions involved substantial sexual conduct and on which acts constituted substantial sexual conduct]; see *People v. Fulcher* (2006) 136 Cal.App.4th 41, 59 ["the rule requiring a unanimity instruction does not apply in SVP civil commitment proceedings. [Citations]"].)

Here, trial court instructed the jury that: "All twelve jurors must agree beyond a reasonable doubt that [McClinton] suffers from a diagnosed mental disorder." The court did not commit error by further telling the jurors that they did not have to agree on which specific mental disorder McClinton suffered from because the unamity rule does not apply to each subpart of the SVP determination.

### 2. Lack of Recent Overt Act

The trial court instructed the jury on the third element of an SVPA commitment as follows: "3. As a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior." (CALCRIM No. 3454.) McClinton argues that the trial court committed error by denying his request for the following special instruction: "While '[d]anger to health and safety of others' does not require proof of a recent overt act while the offender is in custody, you may still consider the absence of such conduct in reaching a determination on this issue." We disagree.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial

34

evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)  A court may refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomplete.  (*Harris v. Oaks Shopping Center* (1999) 70 Cal.App.4th 206, 209.)  A court also may refuse a requested instruction when the legal point is adequately covered by other instructions.  (*Arato v. Avedon* (1993) 5 Cal.4th 1172, 1189, fn. 11.)

The SVPA states that:  "'Danger to the health and safety of others' does not require proof of a recent overt act while the offender is in custody."  (§ 6600, subd. (d).)  "Due process does not require that the absurd be done before a compelling state interest can be vindicated.  As in the present case, [an MDSO] may have a predisposition to commit a specific type of sexual offense—one that cannot, as a practical matter, be committed during confinement."  (*People v. Martin* (1980) 107 Cal.App.3d 714, 725.)

Here, the trial court's jury instruction regarding the third element of an SVPA trial (likelihood of future dangerousness) accurately states the law.  (See CALCRIM No. 3454.)  We agree with the Attorney General that McClinton's proposed special instruction was "argumentative because it unduly emphasized the absence of a recent overt act" and invited the jury to draw favorable inferences based on the absence of such an overt act while he was in custody.  (See *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335 ["A party is not entitled to have the jury instructed in any particular phraseology and may not complain on the ground that his requested instructions are refused if the court correctly gives the substance of the law applicable to the case"].)  The court did not commit instructional error.


*3.  Refusal to be Interviewed by Dr. Longwell*

McClinton argues that the trial court erred by denying his request to instruct the jury that his "refusal to be interviewed by Dr. Longwell" could not be used "as evidence against him."  (Original capitalization and boldfacing omitted.)  We disagree.

35

"A criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142.) Specifically, a criminal "[d]efendant is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt . . . ." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230.) But where other standard jury instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused. (See *People v. Gutierrez*, *supra*, at p. 1144 ["the standard manslaughter instructions given adequately covered the valid points in the proposed pinpoint manslaughter instructions"].)

In this case, the trial court instructed the jury that: "A respondent has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the petitioner has failed to prove the allegations in the petition beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the respondent did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way." (CALCRIM No. 355.)

During discussions regarding proposed jury instructions, McClinton's counsel asserted that McClinton had a constitutional right not to speak with Dr. Longwell. She argued: "The fact that he utilized his right not to . . . talk to her should also be mentioned within the jury instruction [CALRIM No. 355]." The court stated, "Well, let me just point out that issue was explained by Dr. Longwell. She testified that she advised the defendant that he doesn't have to speak to her."

After some discussion, the trial court said, "Listen, I'm *not* going to change the jury instruction, but I'm *not* going to permit the People to argue . . . that the jury should draw a negative inference from the fact that the defendant chose not to talk to Dr. Longwell." (Italics added.) The court went on to tell the prosecutor that he could point out that Dr. Longwell did not have certain information because McClinton refused

36

to talk to her, but the court said that "you cannot argue to the jury that that makes it more likely that any of the [SVPA] criteria are satisfied."

Here, assuming that McClinton, in fact, had a constitutional right not to speak to Dr. Longwell, McClinton's proposed modification to CALCRIM No. 355 was unnecessary.  As the trial court pointed out, the jury heard testimony from Dr. Longwell (the People's expert) that McClinton had a right not to speak with her.  Further, the court instructed the jury on proof beyond a reasonable doubt (CALCRIM No. 219), and that they were to make their decision "based only on the evidence presented to you in this trial."  (CALCRIM No. 200.)  Moreover, the court effectively admonished the prosecutor that he could not argue that McClinton's refusal to speak to Dr. Longwell could be used as substantive evidence concerning the SVP elements.  Thus, we find no instructional error in the court's refusal to modify CALCRIM No. 355.

### 4.  Difficulty in Controlling Dangerous Behavior

McClinton argues that the trial court erred "by not instructing the jury that the statutory requirement for finding [him] likely to reoffend meant that it had to find he had 'serious difficulty in controlling his behavior.'"  He is mistaken.

McClinton acknowledges that the Supreme Court has squarely rejected this identical argument.  (See *People v. Williams* (2003) 31 Cal.4th 757, 774-776 (*Williams*).)  In *Williams*, the Court reasoned that the language of the SVPA "inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes *serious difficulty in controlling one's criminal sexual behavior*."  (*Id*. at p. 759, italics added.)

Nevertheless, McClinton argues that *Williams*, *supra*, 31 Cal.4th 757, was "wrongly decided."  We are required to follow the decisions of the California Supreme Court.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["all tribunals exercising inferior jurisdiction are required to follow decisions of courts

exercising superior jurisdiction"].)  Consequently, we summarily reject McClinton's claim of instructional error in this regard.

## G.  Cumulative Error

McClinton argues that the cumulative effect of his prior claims of error compels reversal of the jury's SVPA finding.  We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself."  (*In re Reno* (2012) 55 Cal.4th 428, 483.)  However, the rejection of each of a defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate."  (*Ibid*.)

Here, since we have found no individual claim of error to be meritorious, there are no errors to cumulate.

## H.  Conditional Release

A person civilly committed under the SVPA may petition for conditional release (outpatient treatment), with or without the concurrence of the SDSH.  (§ 6608, subds. (a) & (d).)  However, "[a] hearing upon the petition shall not be held until the person who is committed has been under commitment for confinement . . . for not less than one year from the date of the order of commitment."  (§ 6608, subd. (f).)

Here, four days after the trial and his SVPA commitment, McClinton filed a petition for conditional release.  The trial court found the petition to be untimely and did not conduct an evidentiary hearing.  McClinton argues that the SVPA violates equal protection because MDOs—unlike SVPs—have an opportunity to petition for immediate conditional release. (Pen. Code, § 2972, subd. (d).)  We disagree.

In *People v. McKee* (2012) 207 Cal.App.4th 1325, 1347 (*McKee II*), the Court of Appeal held that the disparate treatment of SVPs and MDOs did not violate

equal protection because SVPs pose a much greater danger to society. The evidentiary record established that this danger is manifested in three ways: 1) SVPs are more likely to reoffend than MDOs when released; 2) the victims of sex offenses suffer unique, and, in general, greater trauma, than other victims; and 3) SVPs are less likely to participate in treatment and are more likely to be deceptive and manipulative than MDOs. (*Id*. at pp. 1340-1347.) *McKee II* held that these differences justify disparate treatment of SVPs and MDOs regarding their liberty interests (the length of their commitment and the conditions for release). (*Ibid*.; see *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864 ["It is plain that *McKee II* [,*supra*, 207 Cal.App.4th 1325,] is not to be restricted to Mr. McKee alone . . . , but rather its holding applies to the class of SVPS as a whole"].)

In *People v. Bocklett* (2018) 22 Cal.App.5th 879 (*Bocklett*), the court addressed the same equal protection issue that McClinton raises here: the one-year delay in SVPs seeking conditional release: "Bocklett's argument that *immediately* upon his initial commitment he should be allowed to petition for release, rather than wait a year, is simply a repackaging of the argument rejected in *McKee II* that a less restrictive means existed (e.g., a shorter commitment term, such as immediate release) to further 'the compelling state interests of public safety and humane treatment of the mentally disordered.' (*McKee II*, *supra*, 207 Cal.App.4th at p. 1349.) Applying the reasoning in *McKee II*, we conclude that the one-year waiting period is necessary to further the compelling state interest in providing treatment to SVP's and protecting the public, and that there is no less burdensome alternative to effectuate those interests. Accordingly, we conclude that the one-year waiting periods in the [SVPA] do not violate Bocklett's constitutional equal protection rights." (*Bocklett*, *supra*, 22 Cal.App.5th at pp. 899-900.)

Here, we also apply the reasoning in *McKee II*, *supra*, 207 Cal.App.4th at page 1349. Similar to *Bocklett*, *supra*, 22 Cal.App.5th 879, we hold that the one-year

39

waiting period for conditional release under the SVPA does not violate McClinton's constitutional right to equal protection of the law.  (§ 6608, subd. (f).)

*I.  Fundamental Constitutionality of the SVPA*

McClinton summarily argues that the SVPA fundamentally violates several clauses under the state and federal constitutions:  ex post facto, double jeopardy, due process, and equal protection.  McClinton acknowledges that these same "challenges that have been previously rejected by the California Supreme Court and numerous other courts of appeal."  (See, e.g., *McKee I*, *supra*, 47 Cal.4th at pp. 1188-1196.)  Nevertheless, McClinton raises these challenges "to preserve them for further state and/or federal review."

To conclude, under stare decisis principles, we find that the SVPA does not violate the state and/or federal constitutions on any of the grounds raised by McClinton in this appeal.  (See *Auto Equity Sales v. Superior Court*, *supra*, 57 Cal.2d at p. 455.)

III

DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.